DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
                     SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,


v.                                    CRIMINAL ACTION
                                      NO. 15-20713
TOMMY LEE JONES,

                    Defendant.

_____/

                    JURY TRIAL-VOLUME 2
           BEFORE THE HONORABLE JOHN CORBETT O'MEARA
                 United States District Judge
           Ann Arbor U.S. Courthouse & Federal Building
                    200 East Liberty Street
                     Ann Arbor, Michigan
                   Tuesday, November 1, 2016

APPEARANCES:
MARGARET M. SMITH
United States Attorney's Office
211 West Fort Street-Suite 2001
Detroit, Michigan 48226-3220
313-226-9135
Email: Margaret.Smith@usdoj.gov
          On behalf of Plaintiff.

JOHN F. ROYAL
615 Griswold
Suite 1724
Detroit, Michigan 48226
313-962-3738
Email: johnroyal@ameritech.net
ALSO PRESENT:  Denise Heberle, Esq.
          On behalf of Defendant.
                              - - -
Andrea E. Wabeke, CSR, RMR, CRR
Official Court Reporter
www.transcriptorders.com
734.741.2106 x2212

# I N D E X

| Proceeding | Page |
|---|---|
| Opening Statement by Ms. Smith................ | 105 |
| Opening Statement by Mr. Royal............... | 112 |
| **RAYMOND NICHOLS** | |
| Direct Examination by Ms. Smith............... | 118 |
| Voir Dire Examination by Mr. Royal............ | 160 |
| Direct Examination(cont'g) by Ms. Smith....... | 161 |
| Cross Examination by Mr. Royal............... | 189 |

# E X H I B I T S

| Exhibit No. | Offered | Received |
|---|---|---|
| Government's 1, 1A-1I.... | 143 | 144 |
| Government's 2.......... | 152 | 152 |
| Government's 3, 3A-3E.... | 154 | 154 |
| Government's 4.......... | 160 | 160 |
| Government's 5.......... | 173 | 173 |
| Government's 7.......... | 123 | 124 |
| Government's 16.......... | 163 | 164 |
| Government's 17.......... | 186 | 186 |

Jury Trial-Vol.2                           11/1/2016

1              Ann Arbor, Michigan

2              November 1, 2016

3              9:28 a.m.

4                        -  -  -  -

5      **THE CLERK:**  Court calls the matter of United States

6   of America versus Tommy Lee Jones, case number 15-20713.

7      **THE COURT:**  Counsel please put your appearances on

8   the record.

9      **MS. SMITH:**  Good morning, your Honor.  Maggie Smith

10  appearing on behalf of the United States, and with me at

11  counsel table is Special Agent Raymond Nichols with the FBI,

12  and paralegal specialist Danielle Fawaz with my office.

13     **THE COURT:**  Good morning.

14     **MR. ROYAL:**  Good morning, your Honor.  May it please

15  the Court.  John Royal appearing as attorney of record on

16  behalf of Tommy Jones, and Mr. Jones is standing next to me

17  here at counsel table, and I'm also assisted today once again

18  by Attorney Denise Heberle.  Thank you, your Honor.

19     **THE COURT:**  Thank you.  You can sit down for a

20  minute.  We have this note that was read to you at the end of

21  the day yesterday, which has to do with the need that one juror

22  has to go on the universal prepaid vacation.  Before I started

23  sitting with juries and maybe with clients before that, I never

24  knew there was such a thing as a prepaid vacation, but they all

25  are now.  I don't know how that works, but she's -- she says

Jury Trial-Vol.2                          11/1/2016

1   she's going to be leaving the country on Friday and will not

2   return until next Wednesday and I -- Mr. Barkholz and I have

3   discussed this morning the possibility that she could be absent

4   a day next week and we wouldn't be in session that day, but she

5   clearly is saying that she wouldn't return until Wednesday, and

6   that's two days, and I assume that she's -- unless we do

7   something that we aren't going to do to maintain her in place,

8   that she's excusable and we won't have her on the jury and I --

9   you can make a record with regard to anything you want to say

10  about that, but go ahead.

11          MS. SMITH:  Thank you, your Honor.  I don't have an

12  objection if you make the determination that she ought to be

13  excused.  I don't think this would be the first case where we'd

14  only have one alternate to choose from at the end, but I don't

15  think that we should delay this trial or take an additional day

16  off to accommodate her prepaid vacation.  So I have no

17  objection if you wish to excuse her and we could go ahead --

18          THE COURT:  That's really my conclusion too.  Maybe

19  one day off would be something we can talk about; I don't think

20  two days is though.  Yes, sir?

21          MR. ROYAL:  Your Honor, I do object to excusing her.

22  When I'm selecting a jury I'm looking for a certain mix of

23  people who I think will interact in a productive way and this

24  particular juror was an essential part of the mix of jurors

25  that I saw in this jury box, and I -- I had four peremptory

Jury Trial-Vol.2                          11/1/2016

1    challenges left that I did not exercise, and if this juror had

2    not been in the box, I probably would have continued to

3    exercise challenges trying to recreate a particular mix of

4    people.

5          So if the Court is inclined to excuse this juror, I

6    would like the record to reflect that I am moving for a

7    mistrial and suggest that we start over again.  My suggestion

8    would be, and this is not unusual in federal court trials, I

9    know I've had trials where the Court took a week vacation in

10   the middle of a trial.  I don't have any problem with delaying

11   this trial by a couple of days to accommodate this juror's

12   vacation and we could resume next week upon her return.  So my

13   position is that we should accommodate her rather than excusing

14   her at this time.

15         **THE COURT:**  I understand your position, and the

16   record now is clear on that, and I even understand why you're

17   in the position that you want to file that objection and maybe

18   even realize upon it if that's possible, but I don't think, as

19   I said, that two days off is justified, and we all end up with

20   jurors we don't understand, and I will let Miss Ogburn out, and

21   maybe there are two others, but maybe not the right color, and

22   I understand that.  Maybe they're not African-American, but I'm

23   not going to do what was apparently done until the Sixth

24   Circuit told us we couldn't.  I'm not going to make decisions

25   based upon anybody's race, one way or another, and so I guess

Jury Trial-Vol.2                              11/1/2016

1    based upon what the Government says, I will tell Miss Ogburn

2    that she is excused and your motion for a mistrial is denied,

3    but you've made it.

4              **MR. ROYAL:**  Thank you, your Honor.

5              **THE COURT:**  The record is -- yes?

6              **MS. SMITH:**  Your Honor, I have one matter I'd like to

7    put on the record before we bring in the jury, if I may.

8              **THE COURT:**  Yes.

9              **MS. SMITH:**  Yesterday, we had a discussion about a

10   couple of things regarding potential impeachment material for

11   Special Agent Nichols.  I want to place on the record that this

12   morning I turned over to the Defense that second search warrant

13   that he had requested.  It was an affidavit that was dated

14   January of 2016.  I turned that over to the Defense this

15   morning.

16             Secondly, I did a little bit of research on

17   impeachment material as it pertains to that picture that the

18   Defense has asked me to produce, and it is my position that

19   when Special Agent Nichols testifies, if the Defense attorney

20   so chooses, he may use that picture for impeachment purposes

21   only.  I believe it's an extrinsic piece of evidence that is

22   inadmissible and also cannot be used with any other witness,

23   but I'm not going to object if he wants to attempt to impeach

24   him with using that picture during cross examination.

25             **THE COURT:**  I understand what you're saying, and it's

Jury Trial-Vol.2                              11/1/2016

1    conceivable, I suppose, that the Defense might take a different

2    position on that and if they do, we can resolve it at the time

3    it happens as far as using it for impeachment goes.

4              **MS. SMITH:**  Thank you, your Honor.

5              **MR. ROYAL:**  I acknowledge receipt of the application

6    for the second search warrant.  I acknowledge being informed by

7    Ms. Smith of her position with respect to that photograph.  I

8    obviously disagree with the issue of being able to use it for

9    impeachment, but I appreciate making it available and I will be

10   using it during my examination of Agent Nichols.

11             **THE COURT:**  Thank you.  Anything else?

12             **MS. SMITH:**  Not from the United States, your Honor.

13             **MR. ROYAL:**  No.

14             **THE COURT:**  We're ready for opening?

15             **MR. ROYAL:**  One thing, your Honor.  I received

16   yesterday for the first time copies of the Government's trial

17   exhibits, and last night I -- because the standing order for

18   discovery of this Court requires that objections to exhibits be

19   made promptly after receiving them, I prepared last night a

20   document that I've entitled Defendant Tommy Lee Jones

21   Foundational and Other Objections to Government's Proposed

22   Exhibits.  This document contains some objections that I will

23   be making during the course of the trial.  It may be that as

24   testimony proceeds I will withdraw some of these objections,

25   but I just wanted the Court to know I did file this document.

Jury Trial-Vol.2                          11/1/2016

1    I've presented copies to counsel and to the Court and my

2    secretary will be filing it electronically this morning.

3              **THE COURT:**  Thank you.  It's noted.  Anything further

4    before I bring the jury in?

5              **MS. SMITH:**  No, your Honor.

6              **MR. ROYAL:**  Not from the Defense, your Honor.

7              **THE COURT:**  Let's bring in the jury.

8                   (Jury in 9:38 a.m.)

9              **THE COURT:**  Members of the jury, please be seated.

10   Thank you for being here.  Thank you for planning the traffic

11   on the road which in some cases I think was fairly severe this

12   morning.

13             We have a special situation which we'd rather not

14   have but which we've got to deal with, and that is that, is it

15   Juror Number 12, Miss Ogburn, you have -- you're going to be

16   out of the country?

17             **JUROR NO. 12:**  Yes.

18             **THE COURT:**  And we have discussed this and

19   concluded -- the Court has concluded that there is no way to

20   adjourn what we're doing here for a period of time when you're

21   out of the country.  So we're going to excuse you -- I'm going

22   to excuse you as of right now.  If you'd gather all of your

23   materials, books, coat whatever you've got to have, and thank

24   you --

25             **JUROR NO. 12:**  Thank you.

Jury Trial-Vol.2                              11/1/2016

1          **THE COURT:**  -- for your service and have a good trip.

2          **JUROR NO. 12:**  Thank you.

3          **THE COURT:**  We now have 13 of you in the jury box and

4    we'll go with that.  I just want to --

5                  (Juror No. 12 left the courtroom at 9:39 a.m.)

6          **THE COURT:**  And now we're at that point where the

7    parties make opening statements and the Government can make its

8    opening statement.

9          **MS. SMITH:**  Thank you, your Honor.  May I begin?

10         **THE COURT:**  Excuse me?

11         **MS. SMITH:**  May I begin?

12         **THE COURT:**  I'm sorry?

13         **MS. SMITH:**  May I begin?

14         **THE COURT:**  You may begin.

15                                              (9:40 a.m.)

16         **MS. SMITH:**  Thank you.  Secrets and lies.  On the

17   morning of October 23rd, 2015, a little over a year ago today,

18   the Defendant's secret life on the Internet was about to be

19   revealed, because just a few days before that, FBI Special

20   Agent Ray Nichols was working hard undercover to find people

21   who were trading child pornography on-line.

22         Now, how do people conduct this illegal activity?

23   You're going to learn that there are special file sharing

24   programs, software available on the Internet.  Sometimes it's

25   called peer-to-peer file sharing programs.  They're available

Jury Trial-Vol.2                          11/1/2016

1    to download off the Internet.  One of those programs is called

2    Ares, A-r-e-s, like the zodiac symbol.  The Ares program allows

3    users to share electronic files with each other over the

4    Internet.  Basically, it's group of individual computers across

5    the country or even across the world that are hooked in

6    together so that they can share their files with each other.

7              This is just a small graphic to explain how peer to

8    peer works.  In any given network, there could be hundreds, if

9    not thousands of these computers all connected with each other

10   communicating, if you will, with each other.

11             Not only that, but users of peer-to-peer softwares

12   can title their files in such a way as to draw attention to the

13   files that they're offering up to others and gain more traffic

14   into their peer-to-peer program.  Just to give you an example.

15   Let's say you had a peer-to-peer program and you wanted to find

16   files that had to do with Corvettes.  When you open up the Ares

17   peer-to-peer, you have an opportunity to type into the search

18   bar, you type in a word that you're looking for and then the

19   program will go out to all of those other computers that are

20   hooked in with you and look for any files that have the word

21   "Corvette" in them.  You could get music files.  You could get

22   video files.  You could get image files.

23             The program will compile a list for you in your

24   program and you select the files that you want to keep.  You

25   check them off.  You download them to your computer, and then

Jury Trial-Vol.2                              11/1/2016

1    they're yours.

2              Now, the people that Special Agent Nichols was

3    investigating back last October weren't trading pictures of

4    cars.  They weren't trading recipes or even bootleg copies of

5    movies that are now in theaters.  No.  Special Agent Nichols

6    was undercover looking for individuals who were trading up

7    files of child pornography.  You're going to learn through this

8    case that the currency isn't cash, it's additional images and

9    videos.  The underground world of child pornography can only

10   survive by like-minded people giving out files to get new files

11   in return, and that's the best way to commit this crime,

12   because as you will learn, the FBI doesn't ever send out child

13   pornography, ever.

14             Secrets.  The evidence is going to show that between

15   October 18th and 19th, 2015, the Defendant was offering up 24

16   files that caught Special Agent Nichols' attention.  Why did

17   they catch his attention?  Because they either contained a

18   unique identifier -- that is sometimes called a hash value --

19   that's indicative of child pornography or the files contained

20   key words that would indicate that they were full of child

21   pornography.  Child pornographers, you're going to learn, have

22   their own secret language and terms that mean nothing to you

23   and me are actually secret terms used by people to advertise

24   and trade their child pornography on-line.

25             Now, this is a chart you'll see later on in this case

```
 1   that shows a number of downloads under the file name -- I'm
 2   going to -- these are the last three files.  Let me give you an
 3   example of these secret terms.  You see the letters P-T-H-C,
 4   which is -- on the last one, africa tribe pthc, as well as the
 5   one up top where it says "pthc".  That's an acronym.  That
 6   probably means nothing to you and me, but it actually stands
 7   for Preteen Hardcore.  It's one of those terms that child
 8   pornographers know to use when they're looking for particular
 9   files on the Internet.
10          Special Agent Nichols will explain to you that
11   between October 18th and 19th, he was able to download a number
12   of files from the Defendant.  They were all video files.  They
13   ranged in time from just under 20 seconds to over a half an
14   hour, and when he watched those videos, he saw children or what
15   appeared to be children being forced to engage in sex acts
16   alone, with other children and with adults.
17          Special Agent Nichols got to work tracking down the
18   house that had this particular Internet address that had given
19   him those files, and a few days after his undercover session,
20   he and his team executed a federal search warrant at the
21   Defendant's house in Dearborn Heights, Michigan.
22          Secrets.  Before obtaining the search warrant,
23   Special Agent Nichols did his due diligence and looked into the
24   Defendant's criminal history.  As it turned out, in 1991 he was
25   convicted of a crime called gross sexual imposition of a minor.
```

Jury Trial-Vol.2                              11/1/2016

1    The victim was the Defendant's nine-year-old sister.

2          Lies.  On the day of the search warrant, agents made

3    entry into the house and discovered the Defendant and his

4    pregnant stepdaughter, Courtney.  You're going to learn that

5    she shared a bed with him in the basement of that house while

6    her mother, Defendant's wife, slept on the pullout couch in the

7    upstairs room, and she was pregnant with his child.  While 21

8    years old a year ago, the Defendant eventually admitted that

9    he'd engaged her in a sexual relationship as early as 16 years

10   old.

11         During the execution of that search warrant, the

12   agents located and seized a laptop computer which contained

13   evidence of that Ares peer-to-peer file sharing program, as

14   well as over 20 videos that depict what appear to be children

15   engaged in sexual activity.  Some of the videos that Special

16   Agent Nichols had downloaded back on October 18th and 19th were

17   found on the Defendant's computer hidden in a secret folder on

18   his hard drive.

19         Special Agent Nichols also recovered hundreds of

20   search terms that the Defendant had typed into that

21   peer-to-peer program when looking for files.  Do you remember

22   that secret language we talked about earlier?  The evidence

23   will show that the Defendant knew that, knew it well, and used

24   it, and during the search that day, you will learn that the

25   Defendant confessed, not once but twice to different agents

```
 1   about his on-line behavior; his secrets revealed.  He admitted
 2   to downloading child pornography.  He estimated that he
 3   downloaded files less than 100 times, although the agents found
 4   more than three times that amount going through the Ares
 5   registry.
 6           Ladies and gentlemen, these videos show the shameful
 7   secrets of hundreds of sexual abusers all over the world,
 8   prepubescent children, naked, exposing their genitals, being
 9   forced to pose for the camera that would forever memorialize
10   their sexual abuse, children being raped and sodomized and
11   forced to perform oral sex on adults.
12           During the course of this trial, we will prove that
13   this Defendant, using the Internet and his Ares peer-to-peer
14   file sharing program, advertised, distributed, received and
15   possessed sexually explicit videos involving children.
16           During the course of this trial, you're going to meet
17   some of the agents involved in this investigation.  You've
18   heard their names yesterday during jury selection.  You're
19   first going to meet Special Agent Nichols and he's going to
20   testify twice during this trial.  First, he will testify and
21   explain to you the undercover investigation and the search
22   warrant and testify to the Defendant's confession.  Later on in
23   this case, he will testify again as the forensic examiner of
24   the laptop computer that was seized from the Defendant, and as
25   I stated yesterday you're also going to see the evidence of the
```

Jury Trial-Vol.2                          11/1/2016

1   video files.  Understandably, this may not be easy for you, but

2   of hours and hours of video in this case, I have clipped it

3   down to four exhibits each under 30 seconds a piece.  Before I

4   publish any of this material to you, the agent on the stand

5   will give a general description and we will alert you that it's

6   going to be displayed.

7          Now, at the end of this case, the Judge is going to

8   instruct you on the law, but it really is not complicated.  The

9   Defendant has been charged with four separate counts,

10  advertising child pornography, distributing child pornography,

11  receiving child pornography and possessing child pornography.

12         It is the Government's burden to prove each and every

13  element of these offenses beyond a reasonable doubt, and at the

14  end of the trial, we will have done just that.  Ladies and

15  gentlemen, this is a simple case.  The Defendant used the

16  Internet to fuel his sexual desires by providing, trading,

17  distributing and downloading videos of children being forced to

18  engage in sex acts, and when you have seen and heard all the

19  evidence in this case, we will have proven well beyond all

20  reasonable doubt that this man is guilty of the crimes charged,

21  and I will ask you to hold him accountable.  Thank you.  Thank

22  you, your Honor.

23         **THE COURT:**  Thank you, Ms. Smith.  And for the

24  Defendant.

25                                              (9:52 a.m.)

Jury Trial-Vol.2                    11/1/2016

1              **MR. ROYAL:**  Thank you, your Honor.  May I begin?

2              **THE COURT:**  You may.

3              **MR. ROYAL:**  Good morning, ladies and gentlemen.  I'm

4     sure you all understand that this is a very serious case and I

5     appreciate and my client appreciates your willingness to

6     participate in this process and not come up with some excuse as

7     to why you should be excused for jury service.  So we thank you

8     in advance for giving up your time and paying attention closely

9     to the very important testimony and the issues in this

10    particular case.

11             Ms. Smith has just spoken to you.  She is the

12    Assistant United States Attorney assigned to handle this case.

13    I now have the opportunity to speak to you on behalf of my

14    client, Tommy Lee Jones, to give you some idea of how we view

15    this case and our view on some of the evidence you will be

16    hearing, but you should understand that the statements of the

17    attorneys, either now or throughout the trial, are not

18    evidence.  Neither Ms. Smith nor I have any personal knowledge

19    about this case.  Under our rules of evidence, you have to

20    judge this case based on the testimony of the witnesses who

21    have personal knowledge and who can be examined and cross

22    examined about their observations and their information for you

23    to consider.

24             In addition, the opening statements are really an

25    idea to give you sort of an outline or a framework of how the

Jury Trial-Vol.2                    11/1/2016

1   case is set up so that as each individual witness testifies,

2   you'll have some idea where they fit in.  You will have to

3   judge a case by the witnesses and not by the attorneys.

4           Now, you've heard that there's been an indictment

5   issued.  An indictment is just a piece of paper that informs my

6   client of the charges against him.  There are certain things

7   that are not evidence.  The fact that an indictment has been

8   issued is not evidence.  The fact that my client has been

9   arrested and brought to trial in this case, none of this is

10  evidence that he's done something wrong.  The indictment states

11  charges that the Prosecutor is here to try to prove to you

12  beyond a reasonable doubt.  If they are not able to prove these

13  charges beyond a reasonable doubt, then my client retains his

14  presumption of innocence and you would have to return a verdict

15  of not guilty.

16          Now, during this trial, there's going to be a lot of

17  evidence.  There's a whole binder of documents and exhibits.

18  You're going to see some videos.  Some things I will be

19  objecting to; some things I will not.  Please keep in mind that

20  my objections are based upon legal principles.  The fact that I

21  don't object to an exhibit does not mean that I think it's

22  meaningful or important or accurate.  You'll have to decide

23  those issues from each exhibit based upon the testimony and the

24  evidence.

25          Now, there is no dispute in this case that you will

Jury Trial-Vol.2                        11/1/2016

1   be seeing child pornography, the videos that you will be seeing

2   we're not claiming they're not child pornography.  That's not

3   an issue.  The Government is required to show you some portion

4   of the evidence because ultimately you have to make the

5   finding, even if it's not an issue that's in dispute, but you

6   don't have worry about agonizing over that because we agree

7   that these videos do contain child pornography.

8           Now, my client, as you've heard, lived with his

9   family in Dearborn Heights, and he was an employee for Wide

10  Open West, for WOW.  He was a service technician who went out

11  every day on calls to various homes to deal with their cable

12  and Internet issues, and because he was an employee, he had the

13  ability to have a subscription to internet and cable service

14  through WOW at a special rate, and so he had signed up to have

15  those services through that company.

16          He lived with his wife, Tiffany Jones, and his

17  stepdaughter, Courtney, had been raised by her grandmother in

18  Cleveland until she reached the age of 16, and at that point,

19  she moved to Dearborn Heights and lived thereafter with her

20  mother and stepfather.  A short distance away, just a few short

21  blocks away lived my client's son, Tommy Lee Jones, III, and

22  that's an important fact to know, because one of the issues in

23  this case is going to be how videos came to be accessible to

24  the federal agents during their investigation.

25          You will learn during this trial that my client was

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   trying to hedge somewhat on his Internet service.  He was

2   trying to set up a what's called a WiFi extender that would

3   extend the range of people who could get on to the Internet

4   essentially through his computer, and that the idea was to try

5   to set it up so that his son would be able to get on the

6   Internet for free by hooking on to the Internet connection in

7   his home.  Although they never successfully got the son hooked

8   on to the Internet, they did put an extender on that covered a

9   substantial part of the immediate neighborhood, meaning that

10  anyone who had -- who was searching for a connection for their

11  Internet, a wireless connection, who found their connection

12  could hook onto, and these are important facts that you'll be

13  learning about during the trial.

14          Now, there's a lot of issues in this trial that we

15  submit have little, if any, connection to the testimony and the

16  evidence.  Although my client has no obligation to testify, as

17  you've been told, I can tell you now he will be testifying in

18  this trial.  He does want to explain to you in his own words

19  what happened.  He wants you to see and hear it from him

20  directly, and he will be explaining to you about the situation

21  in Ohio 25 years ago, when he was 21 years old and he was

22  accused of something by his younger sister, and he will explain

23  to you the circumstances that led to him pleading guilty to the

24  reduced charge and getting a sentence of probation for that

25  offense.

Jury Trial-Vol.2                        11/1/2016

1            Unfortunately, his sister was subsequently the victim

2    of an unrelated homicide and is not someone we can call to

3    testify -- for her to testify so she could explain the

4    circumstances under which that case in Ohio came to be, but we

5    will explain it to you as best that we can.

6            It's also important to keep in mind that your job as

7    jurors is to decide whether or not the Government has proven

8    these four charges or any of them beyond a reasonable doubt.

9    You're not here to sit in judgment over my client's lifestyle

10   or his values or his morality.  I don't condone the fact that

11   he became sexually involved with his stepdaughter.  I don't

12   condone the fact that she in fact has given birth to a child

13   that he is the father of.  We dispute the age at which their

14   sexual involvement began.  We believe the testimony -- the

15   credible testimony and evidence will show that this did not

16   begin until after she was 18.  But you're not going to be asked

17   to judge whether he's a good or bad person because he engaged

18   in an activity that we might disprove of or find to be immoral.

19   That evidence is being presented to you for a limited purpose

20   and you'll be instructed on it by Judge O'Meara at some point

21   before the end of the trial.

22           So please keep in mind the issue here are the four

23   counts related to child pornography.  Those are the issues that

24   you have to decide and decide whether or not the Government has

25   proven them beyond a reasonable doubt.

Jury Trial-Vol.2                    11/1/2016

1            Now, during the jury selection, you were basically

2    told that you should hear all the evidence, all the trial

3    before you start to begin to make up your mind about this case,

4    and that's especially important because under our rules of

5    procedure, the Government presents their case first.  That's

6    because they have the burden of proof.  So I'm asking all of

7    you to please refrain from judging this case until the Defense

8    has had a chance to present our evidence and you've had a

9    chance to hear our closing arguments, because at the end of the

10   trial, after both sides have rested, both Ms. Smith and I will

11   have a chance to address you again in closing argument and I

12   will at that time highlight for you the areas of reasonable

13   doubt in this case that will be apparent from the testimony and

14   evidence that you have heard.  I will ask you at that time to

15   closely examine those areas and to return the only verdict that

16   would be consistent with fairness and justice and that will be

17   a verdict of not guilty.  Thank you very much, ladies and

18   gentlemen.

19           **THE COURT:**  Thank you, Mr. Royal.  And Ms. Smith, are

20   you ready with your first witness?

21           **MS. SMITH:**  Yes, I am, your Honor.  The United States

22   calls Special Agent Raymond Nichols.

23                           **RAYMOND NICHOLS**
     was thereupon called as a witness herein, and after having
24   first been duly sworn at about 10:02 a.m.    a.m. was examined
     and testified as follows:
25           **THE COURT:**  Welcome, Agent Nichols.  Please be

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   seated.

2            **THE WITNESS:**  Thank you, sir.

3                       **DIRECT EXAMINATION**

4   **BY MS. SMITH:**

5   **Q**    Good morning.

6   **A**    Good morning.

7   **Q**    I'm just going to try to arrange this lectern so the jury

8   can see the screen.  Can everybody can see the screen through

9   here?  Okay.  I don't think I have much cord left to work with.

10        Could you please introduce yourself to the jury?

11  **A**    Yes.  My name is Special Agent Ray Nichols with the FBI.

12  **Q**    What is your educational background?

13  **A**    I obtained a Bachelor's degree in computer information

14  systems in 2003.

15  **Q**    What year did you join the FBI?

16  **A**    It would have been February of 2012.

17  **Q**    Since February of 2012, what areas have you been assigned

18  to?

19  **A**    So out of the academy I was assigned to the Detroit

20  division.  Initially, I worked cyber crimes and those included

21  cyber intrusions and Internet fraud.  I was then assigned to a

22  national security squad, and after that, I was assigned to work

23  child pornography matters as a member of a task force.

24  **Q**    And are you currently a member of that task force?

25  **A**    Yes.

1  **Q**    What's it called?

2  **A**    It's called the Southeast Michigan Trafficking and

3  Exploitation Crimes Task Force.  It is SEMTAC for short.

4  **Q**    Did it have a different name prior to being SEMTAC?

5  **A**    Yes.  So initially that task force was called SEMCAC which

6  stood for Southeast Michigan Crimes Against Children Task

7  Force.  However, the middle of last year we also --

8         **MR. ROYAL:**  I object, your Honor.  This is irrelevant

9  as to the change in name of the task force.  It has nothing to

10  do with the issues in this case.

11         **THE COURT:**  Overruled.

12         **MS. SMITH:**  Thank you.

13  **BY MS. SMITH:**

14  **Q**    You may continue your answer.

15  **A**    So in the middle of last year, we also began to

16  investigate labor trafficking and so we changed the name of the

17  task force.

18  **Q**    Just generally speaking what makes something a task force

19  as opposed to a federal agency?

20  **A**    So multiple different task forces throughout the FBI and

21  other law enforcement agencies.  For ours particularly, it's

22  made up of both federal partners -- and those include FBI, as

23  well as HSI and IRS -- and then we have state partners such as

24  the Michigan State Police, Michigan Department of Corrections,

25  and then local departments as well, which would include cities

Jury Trial-Vol.2                        11/1/2016

1    such as Detroit, Romulus, and others.

2    **Q**    Is one of your duties to act as a case agent on a

3    particular investigation?

4    **A**    Yes.

5    **Q**    What does that mean?

6    **A**    So the case agent is the primary investigating agent for a

7    case.  That would be the person who manages the case generally

8    from start to finish, though sometimes we do take cases that

9    are passed to us from other case agents.

10   **Q**    Approximately how many child pornography investigations

11   have you been involved in since 2012?

12   **A**    An estimate would be more than 100.

13   **Q**    And for that number, how many were you the case agent on?

14   **A**    I maintain a caseload of approximately 40 child

15   pornography investigations.  Over two years, I would estimate

16   that to be between 50 and 60 where I was the case agent.

17   **Q**    Were you the case agent involved in the investigation of

18   an individual by the name of Tommy Lee Jones?

19   **A**    Yes.

20   **Q**    And what was the nature of that investigation?

21   **A**    The nature of that investigation was an on-line

22   peer-to-peer child pornography trafficking case.

23   **Q**    Do you see Tommy Lee Jones here in the courtroom today?

24   **A**    Yes.

25   **Q**    Could you point him out and identify an article of

Jury Trial-Vol.2                    11/1/2016

1  clothing he's wearing?

2  **A**    He's sitting at counsel table.  Looks like he has on a

3  black sweater over top of a gray shirt.

4          **MS. SMITH:**  May the record reflect that the witness

5  has identified the Defendant?

6          **THE COURT:**  Yes, the record may.

7  **BY MS. SMITH:**

8  **Q**    Special Agent Nichols, how old is the Defendant?

9  **A**    Forty-six.

10  **Q**    I'm going to turn your attention to your undercover

11  investigation.  On or around October 18th and 19th, 2015, what

12  was the general nature of that investigation?

13  **A**    So if I could back up a little bit.  One of my other

14  duties as a case agent is I run an undercover operation that

15  targets individuals who are trafficking in child pornography or

16  producing child pornography or who are trying to travel to meet

17  a child for sexual acts.

18  **Q**    Are you familiar with the legal definition of child

19  pornography?

20  **A**    Yes.

21  **Q**    And what does that mean?

22  **A**    Generally, that means lascivious display of the genitalia

23  or a child engaged in a sex act, and for that statute, my

24  understanding, is that an individual who has not yet attained

25  the age of 18 when those videos or images were created.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   **Q**     Would that include prepubescent children?

2   **A**     Yes.

3   **Q**     Would that include children who maybe have reached puberty

4   but still are not 18 years old?

5   **A**     Yes.

6   **Q**     How did this particular investigation begin?

7   **A**     It began on October 18th when I was working on an

8   undercover capacity in one of those peer-to-peer file sharing

9   networks.

10  **Q**     Can you explain to the jury what is a peer-to-peer file

11  sharing network?

12  **A**     Probably the easiest description I can give it, it's a

13  group of computers that are connected through the Internet.

14  They have a common goal.  That goal is to share files and those

15  files can range from video files, picture files, music or, in

16  this case, child pornography.

17  **Q**     And how are peer-to-peer file sharing programs related to

18  child pornography investigations?

19  **A**     Peer-to-peer, unfortunately, is one of the common ways

20  that we see that individuals trade child pornography.

21  **Q**     Is there more than one type of peer-to-peer file sharing

22  program available on the Internet?

23  **A**     Absolutely.

24  **Q**     Can you name some of the common programs that you see?

25  **A**     So probably the common programs would be an application

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                         11/1/2016

1  called Bit Torrent.  There's an application called Gigatribe.

2  There's one called Frost Wire, and then the reason we're here

3  today, one called Ares.

4  **Q**    Is that A-r-e-s?

5  **A**    Yes, ma'am.

6  **Q**    How does an individual go about getting a peer-to-peer

7  file sharing program?

8  **A**    So first they have to know about the program.  That can be

9  word of mouth.  They can search it on the Internet.  Once

10  they've decided on a program they want, they have to download

11  that program.  Once it's downloaded, they then have to install

12  it and set it up.  Once it's set up, they can begin searching

13  and sharing files.

14  **Q**    You have an exhibit book in front of you.  I ask you to

15  take it and turn in your book to Government's Proposed Exhibit

16  7.  It consists of 25 pages.  When you're finished looking

17  through that, just look up at me and I'll ask the next

18  question.

19       Do you recognize those pages?

20  **A**    I do.

21  **Q**    What are they?

22  **A**    This is a demonstration that I put together demonstrating

23  on how to download, set up and then search and download files

24  with the Ares program.

25            **MS. SMITH:**  Your Honor, at this time I move to admit

Jury Trial-Vol.2                              11/1/2016

1    Government's Exhibit 7.

2              **MR. ROYAL:**  The Defense --

3              **THE COURT:**  Any objection?

4              **MR. ROYAL:**  The Defense objects to this exhibit.

5    This exhibit is dated March 9, 2016, some five months after the

6    parameters that this case as set forth in the indictment.  The

7    indictment charges crimes which took place between September

8    16th, 2015 and October 23rd, 2015.  This is well after that.

9    There's no claim that my client had anything to do with this

10   exhibit and I think it's irrelevant.

11             **THE COURT:**  Is it the Government's position that this

12   exhibit either represents propensity or probability that's

13   related to the relevant crime?

14             **MS. SMITH:**  It is relevant, your Honor, because it's

15   a demonstrative exhibit that explains how the Ares peer-to-peer

16   file sharing system is set up, and it will help assist the jury

17   in understanding how this program works and how the files come

18   in and go out of the program.

19             **THE COURT:**  Very well.  I understand the Defense's

20   objection but I overrule it.

21             **MS. SMITH:**  Thank you.  At this time, your Honor, I

22   would like to publish these slides to the jury and go through

23   them one at a time, if I may?

24             **THE COURT:**  You may.

25

Jury Trial-Vol.2                          11/1/2016

1  **BY MS. SMITH:**

2  **Q**    Okay.  Let's look at the first page.  What is the jury

3  looking at -- can you see it on your screen, by the way?

4  **A**    I can see it on my screen actually.

5  **Q**    What are they looking at here?

6  **A**    So what they're being looking at here is the home page for

7  the Ares program and that home page is displayed at the top.

8  It's Aresgalaxy.io.

9  **Q**    And is that found on the Internet?

10 **A**    Yes, ma'am.

11 **Q**    Okay.  Let's look at the next one.  What are we looking at

12 here?

13 **A**    So at this point, I am downloading the Ares software and I

14 did that by clicking the green box that was on the previous

15 slide.

16 **Q**    Okay.  And is the program now downloading?

17 **A**    It is.

18 **Q**    And you took a screen shot of the program downloading?

19 **A**    Yes.  You can see it in the gray there.  It says,

20 "download of Ares Galaxy will start in zero seconds."  So it's

21 just getting ready to start.

22 **Q**    Okay.  Next page.

23        What is this?

24 **A**    This slide shows the download is completed and what you

25 see here is the installer for that program.  So this is the

Jury Trial-Vol.2                          11/1/2016

1  piece of software that installs Ares.

2  **Q**    Is this screen shot from what would appear in your

3  Internet Explorer if you were to open up the files to look at

4  what's in your computer?

5  **A**    Yes.  This is in Windows Explorer.

6  **Q**    Excuse me.  Thank you for correcting me.

7        Okay.  Next page?

8  **A**    What this slide is demonstrating is I've now double

9  clicked the installer and this is the first screen that pops

10  up.

11  **Q**    Is that the license agreement for software program?

12  **A**    It is a license agreement and it's a waiver essentially

13  telling you not to do illegal things with the software.

14  **Q**    Next screen.

15        And what are we looking at here?

16  **A**    So as we go through these what I'm doing is I'm taking the

17  default settings.  I'm not changing anything about the software

18  the way it's packaged, and I'm just clicking next to install

19  the program.  So this is the second screen in the install

20  process.

21  **Q**    And if we look in the middle, there is a box that is

22  entitled desktop shortcut.  What does that mean?

23  **A**    That means for this particular installation, it's going to

24  put a shortcut on my desktop for the software.

25  **Q**    And what would that shortcut do?

Jury Trial-Vol.2                              11/1/2016

1  **A**    It would make it easier to launch the program.  So the

2  shortcut would appear on the user's desktop.  They could double

3  click that to launch the program.

4  **Q**    Okay.  Next screen.

5       What is this here?

6  **A**    This is the screen where it asks where we would like to

7  install the software, and again, I checked the default

8  settings.  So it's placing it into the program files under the

9  directory Ares.

10 **Q**    Okay.  Next screen.

11 **A**    At this point, it's showing that the installation is

12 complete.

13 **Q**    Okay.  Let's go to the next screen.

14      What does this show?

15 **A**    So on the previous one, there was a box you could click

16 that says "show details."  And so this is now -- I clicked that

17 box and it's showing me the details of the install.

18 **Q**    Okay.  Next screen.

19      What are we looking at here?

20 **A**    So again, we've installed this software -- I installed

21 this software and then I double clicked the shortcut that was

22 on the top and this is the first screen that I saw.

23 **Q**    And what folder did you see when you went into the

24 library?

25 **A**    So the first thing I see is that tab that says "library"

Jury Trial-Vol.2                              11/1/2016

1   and under that it says "shared folders."

2   **Q**    So the words that are across the top "library, screen,

3   search, transfer, chat and control panel," are those each tabs

4   in the program that you can click over to?

5   **A**    Yes.

6   **Q**    Can we go back out just a second.  At the top it says

7   "Ares 2.2.4.3048."  Can you explain what that means to the

8   jury?

9   **A**    That number is representative of this software version for

10  this particular Ares install, and I chose this version because

11  it's the same version of the software that I was able to

12  download child pornography from on October 18th of last year.

13  **Q**    Next screen.  All right.

14      What are we looking at here?

15  **A**    So this is a tab titled "screen."  From in here, you can

16  watch some TV.  You can listen to Internet radio, and then if

17  you were to want to view media that you had downloaded or that

18  was in your shared library, it would also be displayed in this

19  window.

20  **Q**    When you say media, what do you mean?

21  **A**    For purposes when I say media, I'm talking about music

22  videos or pictures.

23  **Q**    Okay.  Next screen.

24      What are we seeing here?

25  **A**    So what I attempted to do was click on the search tab and

Jury Trial-Vol.2                                11/1/2016

1   it popped up a box that said, "Would you like to choose your

2   nickname now?"

3   **Q**     Okay.  And for this particular demonstration, did you

4   select a nickname?

5   **A**     I did not.

6   **Q**     And in your training and experience, do people choose

7   nicknames or do they allow the computer to choose them for

8   them?

9   **A**     In child pornography investigations, I rarely see anyone

10  with a chosen nickname.

11  **Q**     What happens if you select no?

12  **A**     Ares will generate a nickname and it will show up as the

13  letters A-N-O-N for anonymous and then a random string of

14  numbers.

15  **Q**     Okay.  Next screen.

16        What are we seeing here?

17  **A**     So again, I've now told that thing that I don't want to

18  take a nickname and I'm in the search tab, and this is where a

19  user would search for media.

20  **Q**     Okay.  So that empty box that's kind of a third of way

21  down, what goes in there?

22  **A**     Those would be search terms.

23  **Q**     So an individual can type in a term and then what do they

24  do?

25  **A**     They type in the term and they click the box that says

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                              11/1/2016

1    "search now."

2    **Q**    And can the user select the type of files that they want

3    to download?

4    **A**    Certainly.

5    **Q**    And so it is all of those categories almost like a menu of

6    the different types of files, audio, video, image, documents,

7    software or other?

8    **A**    Yes, ma'am.

9    **Q**    So if one selects all, will the peer-to-peer search for

10   all those files type?

11   **A**    Yes.  It will search for anything essentially that's on

12   the Ares network if you select all.

13   **Q**    In terms of selecting a search term, how does one go about

14   selecting which term to use to get the best results?

15   **A**    Again, it depends on what the user is looking for.  I know

16   in your opening statement you mentioned the word "Corvette."

17   So if one were to use the word "Corvette" to do a search, it

18   would be a very broad search, because there are all different

19   kinds of Corvettes.  There's red Corvettes.  There's '70s

20   Corvettes, 2016 Corvettes, Stingrays.  So you're going to get a

21   much larger and maybe not as refined search result if you use a

22   very broad term.  If you use a very particular term, like red,

23   2016 Corvette Stingray, chances are better that you're going to

24   get exactly what you're looking for if you're looking for a red

25   2016 Corvette Stingray.

Jury Trial-Vol.2                          11/1/2016

1   **Q**    Okay.  Next slide, please.

2        And is this the transfer tab?

3   **A**    Yes.

4   **Q**    So what are we seeing here?

5   **A**    So this is the tab that essentially displays information

6   on whether you are downloading files or whether you are

7   uploading files.

8   **Q**    Okay.  Next tab.

9        Is this the chat tab?

10  **A**    Yes.

11  **Q**    What are we looking at here?

12  **A**    So you're looking at the chat tab, and this is one of the

13  ways that a user on the Ares network can communicate.  There

14  are multiple chat rooms, and it works like any other chat.  You

15  would click on one of those room names, enter in there and you

16  could begin to see that are other people are chatting.  You'll

17  see what they typed.  If you're chatting, they see what you

18  typed.

19  **Q**    Are there other ways to chat on the Ares network?

20  **A**    Other ways to communicate?

21  **Q**    Yes, other ways to communicate?

22  **A**    Yes, ma'am.

23  **Q**    How would that be?

24  **A**    For example, you could place files in your shared folder

25  and that would communicate to other users on the network that

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                    11/1/2016

1   you have files available for download.

2   **Q**    Next screen.

3        This is the control panel tab?

4   **A**    Yes.

5   **Q**    And what are we looking at here?

6   **A**    This is where you can change the multiple different

7   settings for the Ares network.

8   **Q**    And are these the defaults that are checked?

9   **A**    Yes.  I did not change anything in this from default.

10  **Q**    So the default position of the Ares is that it loads when

11  you start Windows?

12  **A**    Yes.

13  **Q**    And it auto connects to the network when you start up

14  Ares?

15  **A**    Yes.

16  **Q**    What does that mean?

17  **A**    So if you were to uncheck that box, you could open up

18  Ares.  It would not connect to the Internet -- to the Ares

19  network, and you would be able to view files you downloaded or

20  files that were in your shared folder.

21  **Q**    If you are connected to the Ares network, does it allow

22  the trading of files even if you're not sitting behind the

23  computer?

24  **A**    Yes.

25  **Q**    Okay.  Next screen.

USA v Jones, Case No. 15-20713

1       This looks like another part of the control panel.  What

2   are we looking at here?

3   **A**    This is the tab where you can set up -- it's called the

4   transfer tab, and this is where you can set limits on the

5   amount of files that are allowed to be downloaded from you and

6   the files that you can download.

7   **Q**    And these are the default settings?

8   **A**    Yes.

9   **Q**    And so the default setting is "six uploads allowed at

10  once."  What does that mean?

11  **A**    That means at any one given time, this piece of software

12  will only allow six files to be downloaded from this computer

13  at one time.

14  **Q**    And three uploads per user.  What does that mean?

15  **A**    So in addition to that six -- so there can only be six

16  uploads.  So only six files can be downloaded at once.  This is

17  saying each user can only download a max of three files at

18  once.

19  **Q**    And then "ten downloads allowed at once."  What does that

20  mean?

21  **A**    That is a number that indicates that for this particular

22  software, if I was using it, I could download 10 files at once,

23  but if I tried to download number 11, it would go into a queue

24  and it would wait until one of my other downloads finished.

25  **Q**    Now, down towards the bottom, there's entitled "downloads

1  are saved into folder," and it looks like there's a file path,

2  C/users/testuser/desktop/my shared folder.  What part of that

3  is the default?

4  **A**    So the default is going to be -- I guess maybe I should

5  explain how this works for Windows.  The C drive is generally

6  your main hard drive in a computer.  It's where the operating

7  system generally resides as long as nothing has been changed.

8  Users is the folder that contains information for all the users

9  of that computer.  In this case, test user is the user file or

10  folder for the user I created for this demonstration.  Desktop

11  is that user's desktop and then my shared folder indicates the

12  name of the Ares share folder.

13  **Q**    Is that the default folder for the downloaded files to go

14  into?

15  **A**    Yes.

16  **Q**    And is "my shared folder" a folder that other people on

17  the network have the ability to go into and take files out of?

18  **A**    Yes.

19  **Q**    Okay.  Next page.

20       So we're back to the search bar.  Did you perform a search

21  to show how a file is brought into the peer-to-peer network?

22  **A**    I did.

23  **Q**    What did you search for in this demonstration?

24  **A**    I searched for a very broad term.

25  **Q**    Okay.  Next page.

Jury Trial-Vol.2                          11/1/2016

1       What's going on in this screen shot?

2   **A**    So at this point, I typed the word "pie" into the search

3   box.  I clicked the search now button, and to the right, you

4   see the words "performing search, please wait" followed by a

5   bunch of dots.  That's indicating that the software is now

6   searching other users on the network for files that contain the

7   term "pie."

8   **Q**    Okay.  Next screen.

9       What are we seeing here?

10  **A**    So at this point, I'm starting to see results of my

11  search.

12  **Q**    And what types of results did the word "pie" return for

13  you?

14  **A**    So in there, I have audio, I have video, and as we scroll

15  down through this, there are pictures as well.

16  **Q**    Okay.  It looks like there's audio file called American

17  Pie.  Are there some foreign titles in here as well?

18  **A**    There are.

19  **Q**    And is that because the peer-to-peer file sharing program

20  goes across the world?

21  **A**    Yes.

22  **Q**    Okay.  Let's look at the next screen.

23      Is this the second part of the return of the titles from

24  the search?

25  **A**    Yes.  And I apologize for this, I actually scrolled down

Jury Trial-Vol.2                          11/1/2016

1   to try and find a file that was suitable for court.

2   **Q**    Okay.  All right.  So are these all the files that are

3   available for the user then to download should they so choose?

4   **A**    Yes.

5   **Q**    All right.  Let's look at the next screen.

6        And did you in fact choose to download one of these files?

7   **A**    I did.

8   **Q**    And which one is that?

9   **A**    It's the one titled "zucchini pie."  It's highlighted in

10  blue.

11  **Q**    And is it -- what type of file is it?

12  **A**    It's a video -- or a picture file.

13  **Q**    And does the -- there's a screen name of t-a-t-a at Ares.

14  Is that the individual that you were pulling the file from?

15  **A**    That's at least one of the individuals I pulled the file

16  from, yes.

17  **Q**    Okay.  Let's go to the next screen.

18       What are we seeing here?

19  **A**    This is the transfer tab we talked about before, and all

20  I'm doing is taking a screen shot of what's going on while that

21  file is downloading.

22  **Q**    So the user can go and watch the progress of the files as

23  they download?

24  **A**    Yes, both for downloads and uploads.

25  **Q**    Okay.  Next page.

1      What do we see here?

2   **A**   We see a green bar that indicates the file was downloaded.

3   **Q**   All right.  Next screen.

4      What's that?

5   **A**   That's -- unfortunately, that's zucchini pie.

6   **Q**   That's the picture you were able to download?

7   **A**   Yes, ma'am.

8   **Q**   All right.  Let's go to the last screen in this series.

9   What are we looking at here?

10  **A**   So what I did here is I went to the Windows Explorer and I

11  navigated to the my shared folder that we saw in the default

12  directory created by Ares, and this is a screen shot of that

13  folder with the only file I have in it, which is the file I

14  downloaded, the zucchini pie.

15  **Q**   Okay.  I'm going to direct your attention to your

16  undercover Ares peer-to-peer program.  Is your Ares program

17  different than the commercially available program?

18  **A**   Yes.  We have a specific version that's written for law

19  enforcement purposes.

20  **Q**   And how is it different?

21  **A**   So it's different in a couple of ways.  One of those ways

22  is that it takes screen shots of the activity.  So as we're

23  downloading files from people, you take the screen shots.  It

24  keeps a log of the activity we do while we're doing those

25  downloads, and the most important thing that it does is it

Jury Trial-Vol.2                          11/1/2016

1    ensures that we only download from one specific user.

2  **Q**   Can you explain how you -- what is that called?

3  **A**   It's called a single source download.

4  **Q**   Is there such a thing as a multiple source download?

5  **A**   Yes.

6  **Q**   What does that mean?

7  **A**   So for peer-to-peer programs, the way it works is, for

8    example, the zucchini pie.  It showed initially I was

9    downloading it from tata@ares.  That may be the initial person

10   but peer-to-peer networks are set up in such a way so that the

11   individual downloading the file is getting it from multiple

12   different people, and that's for a couple reasons.  It's to

13   speed things up and it's also to allow for anonymous access.

14 **Q**   But your peer-to-peer program does not do a multisource

15   download; is that right?

16 **A**   That's correct.

17 **Q**   How is the single source download then used for law

18   enforcement purposes?

19 **A**   So the reason we do a single source download is I need to

20   know at least what IP address that file came from.

21 **Q**   In your undercover work, do you ever send child

22   pornography out to others?

23 **A**   No.  It's against FBI policy.

24 **Q**   Directing your attention to October 18th and 19th of 2015.

25   Were you using this law enforcement file sharing Ares program

Jury Trial-Vol.2                         11/1/2016

1   on that day?

2   **A**    Yes.

3   **Q**    What were you looking for?

4   **A**    I was looking for individuals sharing files of interest on

5   the Internet.

6   **Q**    When you say files of interest, what do you mean?

7   **A**    Any files that appear to be related to child pornography.

8   **Q**    And how would you know if the file is related to child

9   pornography?

10  **A**    There's a couple of ways.  Those two are hash values, as

11  well as file names, which would include search terms

12  essentially.

13  **Q**    Let's go back to what a hash value means.  Can you explain

14  that in some more less technical term?

15  **A**    Yes.  So a hash value is essentially the equivalent of an

16  electronic DNA for a file.  So a file that we have here today,

17  if we were to send it across the Internet and it's still the

18  same file and nothing changed, the hash values would not change

19  either.  Now, if we change one dot on that image, that would

20  change the hash values.

21  **Q**    How are the hash values used for child pornography

22  investigations?

23  **A**    We maintain a list, a database, if you will, of known hash

24  values of child pornography.  So not the images or the videos

25  for those but the hash values that other investigators have

Jury Trial-Vol.2                    11/1/2016

1    seen.

2    **Q**    You also mentioned file names or terms.  In your training

3    and experience, are there certain terminology that you see in

4    child pornography files?

5    **A**    Yes.

6    **Q**    And can you give the jury some examples of those?

7    **A**    So examples of those would be terms such as pthc, pedo,

8    Lolita, Baby Jay, Vicki, Ray Gold, and variants of Ray Gold.

9    We could continue for a long time on that.

10   **Q**    What does pthc means?

11   **A**    It means preteen hard core.

12   **Q**    Is incest another key term that's used in child

13   pornography files?

14   **A**    Yes.

15   **Q**    When you use terms of people like Vicki, what do you mean

16   by that?

17   **A**    So unfortunately, Vicki is associated with a known series

18   of child pornography.  It depicts a little girl who is an

19   identified victim.

20   **Q**    And so when a file is entitled Vicki, does that mean that

21   that particular child is in that video?

22   **A**    No.

23   **Q**    Why would somebody name the file Vicki if that particular

24   child is not in the file?

25   **A**    So again, from my training and experience, there's some

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   artwork that goes into naming these files, and it appears that

2   that's done to generate more downloads essentially.  So if one

3   were to place Vicki in the title and another individual were

4   familiar with that series, they may be prompted to download it.

5   **Q**    And so is it -- is it fair to say that the more well-known

6   term that's used, the more traffic one can generate?

7   **A**    It's possible, yes.

8   **Q**    In your training and experience, do people pay for their

9   child pornography?

10  **A**    Not with money.

11  **Q**    When you say not with money, what do you mean?

12  **A**    Well, I mean the currency for child pornography are more

13  child pornography.  There's a common term, it's called give to

14  get, wherein if you don't provide child pornography to an

15  individual, they won't provide it to you.

16  **Q**    Now, were you able to find a computer of interest on

17  October 18th, 2015?

18  **A**    Yes.

19  **Q**    And what made it of interest to you?

20  **A**    It had 24 files that were either identified by a hash

21  value or the names of the files were consistent with names we

22  see in child pornography investigations.

23  **Q**    And how did you identify this computer?

24  **A**    This is through the Ares peer-to-peer network.

25  **Q**    Were you able to identify an IP address?

Jury Trial-Vol.2                          11/1/2016

1   **A**    Yes.

2   **Q**    Can you explain to the jury what is an IP address?

3   **A**    Probably the best way to explain an IP address is it's the

4   equivalent of the computer version of a telephone number.  If

5   you and I were to make a phone call to each other, you would

6   call my number and then we could begin this conversation, this

7   exchange of data.  For a computer, you're going to use the IP

8   address to initiate a very similar conversation, which is an

9   exchange of data.

10  **Q**    Do you recall the IP address from this undercover

11  investigation?

12  **A**    Yes.

13  **Q**    Okay.  What was it?

14  **A**    I believe it's 69.14.117.120.

15  **Q**    All right.  I'm going to have you look in the exhibit book

16  at Exhibit 1.  It is enumerated 1.  There's Exhibit 1 -- let me

17  look here before I speak -- and then there's A through I.  Do

18  you have a disk in Exhibit 1, in yours?

19  **A**    I do.

20  **Q**    When you look through Exhibits A through I and you finish,

21  look up at me and I'll ask you a few questions.

22          **THE COURT:**  What are you asking Agent Nichols to do,

23  to read them all?

24          **MS. SMITH:**  No.

25          **THE COURT:**  Or just to notice them?

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1           **MS. SMITH:**  Just to look through them, correct.

2    **BY MS. SMITH:**

3    **Q**    Let's start with Exhibit 1?  What is Exhibit 1.

4    **A**    Exhibit 1 is a DVD, and it contains a copy of what we

5    would call an undercover session, and this is the undercover

6    session with the IP address 69.14.117.120.

7    **Q**    Did you create that disk?

8    **A**    Yes, I did.

9    **Q**    Do you have your initials on that disk?

10   **A**    Yes.

11   **Q**    Have you reviewed that disk and put your initials on

12   there?

13   **A**    I have.

14   **Q**    And how about Exhibits 1A through 1I, what's in those

15   exhibits?

16   **A**    So A through I contain screen captures of files as they

17   were attempted to be downloaded, along with the results of

18   those attempted downloads.

19   **Q**    Do those screen shots come from the disk that is in

20   Exhibit 1?

21   **A**    Yes.

22          **MS. SMITH:**  At this time, your Honor, I would move to

23   admit Exhibit 1, including 1A through 1I?

24          **MR. ROYAL:**  I have no objection.

25          **THE COURT:**  Any objection?

Jury Trial-Vol.2                              11/1/2016

1          **MR. ROYAL:**  No, your Honor.

2          **THE COURT:**  Thank you.  They're received.

3          **MS. SMITH:**  I'm going to start publishing these.

4  These are screen shot exhibits.  If I may start publishing them

5  to explain them to the jury.

6          **THE COURT:**  You may.

7          **MS. SMITH:**  Thank you.

8  **BY MS. SMITH:**

9  **Q**    Okay.  Let's look at 1A.  What is the jury seeing in 1A?

10 **A**    So in 1A, as you can see you from the top left corner

11 where it says "LE," that stands for law enforcement.  That's

12 the version of our law enforcement tool that I'm using and this

13 is showing downloads from that IP address we referenced.

14 **Q**    Okay.  What is the title of the file you're downloading?

15 **A**    So I would butcher this name if I try to say it.  It

16 appears foreign.  I do know what sdpa stands for.

17 **Q**    What does sdpa stand for?

18 **A**    It's essentially Spanish for preteen hard core.

19 **Q**    And just for the record, does it say -- I'll give it a

20 try -- chiquilla violada, with (2)(2).mpg?

21 **A**    Yes.

22 **Q**    What does mpg mean?

23 **A**    That is a video file, mpeg.

24 **Q**    How about this string of numbers that begins with five,

25 it's numbers and letters and ends with the letter G.  What is

Jury Trial-Vol.2                          11/1/2016

1   that?

2   **A**    That's representative of the hash value for that file.

3   **Q**    And is this one of the files that you attempted to

4   download from that IP address you just testified to?

5   **A**    Yes.

6   **Q**    All right.  Let's go back out a little bit.

7          What is the status here?

8   **A**    The status shows downloading.  So it's showing that at

9   this point in time when the screen shot was taken, this file

10  was being download from the IP address.

11  **Q**    And what does this mean under the user?

12  **A**    So this is showing me that I'm downloading it from one

13  user, as indicated by the one user, and then it has the user

14  name and the IP address for that user.

15  **Q**    What's the user name?

16  **A**    It's anon_450E7578@Ares.

17  **Q**    Okay.  Let's look at the second page of this exhibit.

18  What are we seeing here?  Is this a continuation of the

19  download?

20  **A**    Yes, it is.

21  **Q**    And on the last page, what are we looking at here?

22  **A**    This is a log showing that for this particular file, I was

23  not able to download the complete file.

24  **Q**    Were you able to download part of this file?

25  **A**    Yes.

Jury Trial-Vol.2                          11/1/2016

1    **Q**    And were you able to view this file?

2    **A**    Yes.  So for video files when they're downloaded, as the

3    way the software works, even if it's a partial download,

4    oftentimes I can actually view the file.

5    **Q**    Now, on the first screen shot, there's a date and time in

6    the bottom right-hand corner.  It says 2015 October 18,

7    22:48:12.  Can you explain to the jury what that time means?

8    **A**    Yes.  So the day I think is pretty self-explanatory.  It's

9    saying October 18th, 2015.  The time is expressed in a 24-hour

10   clock, and that time is actually in what we refer to as UTC

11   time.

12   **Q**    What does UTC time mean?

13   **A**    It stands for a Coordinated Universal Time, and that is

14   widely accepted in the realm of computers, forensics and

15   science as a standard time, and then from that time, we do

16   offsets to determine the time zone that an individual is in.

17   **Q**    So 22:48:12 is the universal time clock?

18   **A**    Yes.

19   **Q**    And so how do we determine what time of day it is in the

20   Eastern District of Michigan from that time?

21   **A**    So there's a chart that's widely available that tells you

22   how to do it.  I can tell you that for this particular time of

23   the year, we would subtract four hours from UTC time.

24   **Q**    Okay.  And I think you answered this question before, but

25   in order to send files out, does a person need to be sitting

USA v Jones, Case No. 15-20713

1  behind the computer?

2  **A**    No.  As long as there are files in the share folder and

3  the Ares program is connected to the Internet, individuals can

4  download from it.

5  **Q**    Okay.  Let's look at 1B.  We'll go through these a little

6  bit faster now we're familiar with what we're looking at.  Is

7  this the second download you attempted?

8  **A**    Yes, it is.

9  **Q**    And what is the file name for this one?

10  **A**    It is dc13(2)(2).mpg.

11  **Q**    And did that file name draw your attention?

12  **A**    No.

13  **Q**    What about the series of letters and numbers beneath that,

14  what is that?

15  **A**    That's the hash value.

16  **Q**    And did that draw your attention?

17  **A**    Yes.  This file was a candidate for download based on the

18  hash value.

19  **Q**    Okay.  Let's go to the last.  Does this show the end of

20  the file, what happened with this file?

21  **A**    Once again, it timed out.  So this was only a partial

22  download.

23  **Q**    But were you still able to view the video?

24  **A**    Yes.

25  **Q**    So just to be clear, when we say a partial download, does

Jury Trial-Vol.2                        11/1/2016

1   that mean that the entire file could have been maybe an hour

2   and you were only able to get the first 15 or 20 minutes of it?

3   **A**    That's a very accurate description.

4   **Q**    Exhibit C, how about this?  Was this another one you were

5   able to attempt download from that IP address?

6   **A**    Yes.

7   **Q**    Okay.  How many total files did you attempt to download

8   between October 18th and 19th, 2015?

9   **A**    It was nine files.

10  **Q**    How many were completed?

11  **A**    Three.

12  **Q**    And how many were incomplete?

13  **A**    Six.

14  **Q**    What's the title of this one?

15  **A**    This one is (2)(2)(2)96.mpg.

16  **Q**    Is that the hash value down below?

17  **A**    Yes.

18  **Q**    And let's go to Exhibit D -- I'm sorry, the last page on

19  C, does this show an incomplete file as well?

20  **A**    Yes, it does.

21  **Q**    All right.  Exhibit D, 1D, what's the title on this file?

22  **A**    So it is (pthc)papafickt und spritz 9yr tochter 4 41 mi.

23  **Q**    You testified before about pthc.  What about the term 9yr,

24  is that significant to your investigation?

25  **A**    Yes.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                        11/1/2016

1   **Q**    Why is that?

2   **A**    So we also see in those search terms or file descriptions

3   a number followed by the letter y-r or y-o, and that's usually

4   indicative of the age of the child depicted in the video or the

5   picture.

6   **Q**    Okay.  The last page on this, and what does this show as

7   to the completeness of this file?

8   **A**    This one timed out as well.

9   **Q**    Okay.  1E, what's the title of this?

10  **A**    Adultpthchussyfankingpasscp03.mpeg.

11  **Q**    What about the term "hussyfan," did that draw your

12  attention?

13  **A**    Yes.  Hussyfan is another one of those words that started

14  as a known series and is now used for child pornography, no

15  matter the series.

16  **Q**    What about the word "kingpass?"

17  **A**    Kingpass is another one that's very similar to hussyfan,

18  wherein there was a series and now it's used to describe all

19  different types of child porn.

20  **Q**    How about the initials cp?

21  **A**    Child pornography.

22  **Q**    Okay.  Let's go to the last page of this.  What does this

23  show?

24  **A**    So this shows that for this particular file I was able to

25  download the entire file.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   **Q**    All right.  Exhibit 1F what's the title of this one?

2   **A**    Kairi.avi.

3   **Q**    Can you spell that?

4   **A**    K-a-i-r-i dot a-v-i.

5   **Q**    Again the hash value is shown underneath there?

6   **A**    Yes.

7   **Q**    Let's go to the last page on that.  What does the last

8   page show?

9   **A**    So this shows that this file timed out.  It was actually

10  attempted to be downloaded twice.

11  **Q**    By you?

12  **A**    Yes.

13  **Q**    Okay.  All right.  Let's go to 1G.  And what's the title

14  of this one?

15  **A**    FLgirlGloriaandunclehardfucking.FLB.

16  **Q**    And what does FLB mean?

17  **A**    That is a type of container for a video file.  So it

18  indicates it's a video.

19  **Q**    Let's go to the last page of Exhibit G.  What was the

20  status on that?

21  **A**    Again, this one timed out.

22  **Q**    Do you know why some of these files timed out on you?

23  **A**    Again, this is -- there's multiple reasons for that.  One

24  of the reasons could be that the user logged out of Ares.  One

25  other reason could be that, again, we're doing single source

1    downloads.  So it could just be that there was an error in the

2    transmission or it -- you know, it could mean that the user

3    took that file out of their share folder and put it somewhere

4    else.  There's a lot of different reasons for that.

5    **Q**    1H, please what is the title on this one?

6    **A**    Goldberg nuba tribe - africa tribe pthc girl.avi.

7    **Q**    Okay.  And we'll go ahead and skip to the last page on

8    this exhibit.  Were you able to complete this download?

9    **A**    Yes.

10   **Q**    Okay.  And let's look at Exhibit I.  This is the last one.

11   What's the title?

12   **A**    So again, I'll read the title.  Those three dots at the

13   end of it indicate that that's not showing the whole title and

14   that's just because of column width of the software.  So it

15   says:  03 pthc r @y gold 12yr daughter and dad 30 mi.

16   **Q**    Now, this word Ray is spelled R with an at symbol and Y.

17   Is this of significance to you?

18   **A**    It's just another one of the ways that Ray Gold, which is

19   a series, is spelled out.

20   **Q**    Let's look at Exhibit -- can you look in your book at

21   Exhibit 2?

22   **A**    Yes, I have 2.

23   **Q**    What is that?

24   **A**    So this is a spreadsheet that gives a description of the

25   file names that I downloaded, whether it was complete, the

Jury Trial-Vol.2                            11/1/2016

1    length of the video and then some other information.

2    **Q**    Is it a summary of the downloads that we just viewed?

3    **A**    That's exactly what it is, yes.

4              **MS. SMITH:**  Your Honor, I move to admit Government's

5    Exhibit 2.

6              **THE COURT:**  Any objection?

7              **MR. ROYAL:**  No objection, your Honor.

8              **THE COURT:**  It's admitted as Government 2.

9              **MS. SMITH:**  Thank you.  May I publish it to the jury?

10             **THE COURT:**  You may.

11   **BY MS. SMITH:**

12   **Q**    Okay.  Now, the jury has seen these titles before because

13   we just went through all of those screen shots.  Does it show

14   the length of the videos you were able to download?

15   **A**    Yes.

16   **Q**    And what's the general length of these videos?

17   **A**    I mean it varies.  Some of them are only 20 seconds and it

18   looks like the longest one there is 30 minutes and 14 seconds.

19   **Q**    Have you reviewed the videos from this summary chart?

20   **A**    Yes.

21   **Q**    And what do these videos depict?

22   **A**    In my opinion, they meet the federal definition of child

23   pornography.

24   **Q**    Do they show children?

25   **A**    They do.

Jury Trial-Vol.2                        11/1/2016

1   **Q**    And are these children prepubescent children?

2   **A**    Some of them.

3   **Q**    Are there some who appear to be children but may be post

4   pubescent?

5   **A**    Yes.

6   **Q**    And what makes them -- when you viewed these videos, what

7   made them appear to be children to you?

8   **A**    So the things that stand out to me are for females,

9   particularly, is lack of breast development.  For both males

10  and females, it's lack of body hair.  Oftentimes, as you look

11  at these files over and over again, you start to notice facial

12  features, and I can't describe it but they just look young.

13  One of the other things is when you compare these individuals

14  that appear to be children to the adults that are in the video,

15  they're significantly smaller in stature.

16  **Q**    And in some of these videos, is there sound?

17  **A**    Yes.

18  **Q**    And in some of the videos with sound, is the sound in a

19  foreign language?

20  **A**    Yes.

21  **Q**    And in some of the videos is there English as well?

22  **A**    There is.

23  **Q**    All right.  I'm going to have you look at Exhibit 3.  That

24  should be a disk.  Do you see that disk?

25  **A**    I do.

Jury Trial-Vol.2                            11/1/2016

1   **Q**    What is that disk of?

2   **A**    That is a disk of the videos that I was able to download

3   from Ares.

4   **Q**    Does that contain the videos that were in the summary

5   chart we just looked at?

6   **A**    Yes.

7   **Q**    Are your initials on that disk?

8   **A**    They are.

9   **Q**    Did you review that disk in its entirety?

10  **A**    Yes.

11  **Q**    Let's look at, if you could please turn to Exhibits D and

12  E -- C, D and E I think I want you to look at.  C, D and E,

13  what are those?

14  **A**    So these are still captures or screen shots of some of

15  those videos that I downloaded.

16  **Q**    And for the record, Exhibit 3A and 3B, are those clips

17  from the videos that are in the disk in Exhibit 3?

18  **A**    Yes.

19          **MS. SMITH:**  Your Honor, at this time I move to admit

20  Exhibit 3, including 3A, B, C, D, and E.

21          **THE COURT:**  Any objection?

22          **MR. ROYAL:**  No, your Honor.

23          **THE COURT:**  It's received as Exhibit 3A, B, C, D and

24  E.

25          **MS. SMITH:**  Thank you, your Honor.  I would advise

Jury Trial-Vol.2                         11/1/2016

1    the Court that I have two exhibits to show to the jury that

2    involve sexually explicit videos.  They are both under 30

3    seconds and I would like permission to play them at this time.

4            **THE COURT:**  You may.  Have we got -- I guess that's

5    consistent with what you just said, but about 11:00 we should

6    take a break.

7            **MS. SMITH:**  Very well.  Yes, your Honor.

8    **BY MS. SMITH:**

9    **Q**    Special Agent Nichols, are some of the videos that you saw

10   called -- would be referred to as a montage?

11   **A**    Yes.

12   **Q**    And what does a montage mean?

13   **A**    That would be a video that has other video clips from

14   other different videos.  So it's a mixture.  It's almost like

15   if you took the series back to the future and mingled one, two,

16   three and four altogether and produced a single video.

17   **Q**    And so in some these videos that are maybe 30 minutes

18   long, is it the same person all 30 minutes or is it a

19   compilation of many different clips of movies together?

20   **A**    Some of them are a compilation of many different clips

21   altogether.

22   **Q**    Okay.  I want to direct you to what we're going to show,

23   Exhibit 3A.  The title -- it's from the video

24   adult pthc hussyfan kingpass cp O3.  Did you review the clip

25   that we are going to play?

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   **A**    Yes, I did.

2   **Q**    And does it depict who appear to be children engaged in

3   sex acts with adults?

4   **A**    Yes.

5          **MS. SMITH:**  Okay.  We're going to publish that video

6   now.

7                (Video played for the jury 10:51 a.m. until

8                10:51 a.m.)

9   **BY MS. SMITH:**

10  **Q**    Okay.  Exhibit 3B that we're getting ready to publish

11  comes from the Goldberg nuba tribe - africa pthc video.  Did

12  you review that clip?

13  **A**    I did.

14  **Q**    And what is it the jury a going to see?

15  **A**    They're going to see a female child who is laying in a

16  bathtub.  Her legs are spread, and in this clip it shows what

17  appears to be an adult hand spreading open her vaginal area.

18  **Q**    Is this video set to music?

19  **A**    It is.

20         **MS. SMITH:**  At this time we will publish Exhibit 3B.

21                (Video played for the jury 10:52 a.m. until

22                10:53 a.m.)

23         **MS. SMITH:**  That's it for now, your Honor.

24         **THE COURT:**  That's all for now?

25         **MS. SMITH:**  Did you want to take a break at this

Jury Trial-Vol.2                    11/1/2016

1   time?  This might be a good place to break.

2           **THE COURT:**  I think that would be a good idea, and I

3   thank you for paying attention.  Please go to the jury room.

4   We'll be back here in 15 minutes.

5               (Jury out 10:53 a.m.)

6           **THE COURT:**  Anything either the Government or the

7   Defendant would like the record to reflect at this time?

8           **MS. SMITH:**  No, your Honor.

9           **MR. ROYAL:**  Not from the Defense, your Honor.

10          **THE COURT:**  Okay.  Let's make -- 15 would be 10

11  after.  The Defendant can go to lockup, if that's what's

12  intended, and back in here at 10 after.

13          **MR. ROYAL:**  10 after.  Very well.  Thank you, your

14  Honor.

15          **MS. SMITH:**  Your Honor, may my witness take a break

16  as well?

17          **THE COURT:**  I'm sorry?

18          **MS. SMITH:**  May my witness take a bathroom break as

19  well?

20          **THE COURT:**  Do you want a bathroom break?

21          **THE WITNESS:**  If you allow, absolutely.

22          **THE COURT:**  Yes, you can.  Court's in recess.

23              (Recess taken 10:54 a.m.)

24          **THE CLERK:**  Court is reconvened in the case of United

25  States of America versus Tommy Lee Jones.

                USA v Jones, Case No. 15-20713

1      **THE COURT:**  We're waiting for the Defendant.  There

2  he is.  Defendant is at counsel table.  Are you ready to

3  recommence?

4          **MS. SMITH:**  Yes, your Honor.

5          **MR. ROYAL:**  Yes, your Honor.

6          **THE COURT:**  Bring in the jury.

7              (Jury in 11:11 a.m.)

8          **THE COURT:**  Please be seated.  Thank you.  Thank you

9  for your attention and for being here, and Ms. Smith, you may

10  continue.

11          **MS. SMITH:**  Thank you, your Honor.

12  **BY MS. SMITH:**

13  **Q**    Special Agent Nichols, before we broke, you were

14  explaining to the jury the completion of the undercover

15  downloads from a particular IP address.  After you completed

16  and reviewed those downloads, what was the next step in your

17  investigation?

18  **A**    The next step was to determine which Internet service

19  provider provided access to that IP address.

20  **Q**    And are you able to do that?

21  **A**    Yes.

22  **Q**    And which service provider was linked to that IP address?

23  **A**    The company is Wide Open West, and they call themselves

24  WOW, W-O-W.

25  **Q**    What did you do with that information?

Jury Trial-Vol.2                          11/1/2016

1   **A**    I subpoenaed, by administrative subpoena, Wide Open West

2   and I requested specifically the subscriber, billing address

3   and service address for the IP address that I had downloaded

4   those files from for a particular date and time that these

5   downloads happened.

6   **Q**    Thank you.  I'm going to turn your attention to the

7   exhibit book.  Can you turn to Exhibit 4, which consists of

8   five pages.  Do you recognize that?

9   **A**    Yes.

10  **Q**    What is that?

11  **A**    That is the subpoena return.  So that's the information

12  that Wide Open West returned to me in response to the subpoena.

13  **Q**    And on the last page of this exhibit, is there a

14  certificate of authenticity of business records?

15  **A**    Yes.

16          **MS. SMITH:**  Your Honor, at this time, I would move to

17  admit Government Exhibit 4.

18          **MR. ROYAL:**  I would like --

19          **THE COURT:**  Any objection?

20          **MR. ROYAL:**  I would like to voir dire, your Honor, on

21  the admissibility of this exhibit.

22          **THE COURT:**  If it is relevant, you may continue with

23  voir dire, but I'll stop you if it isn't.

24          **MR. ROYAL:**  I understand, your Honor.

25                                          (11:14 a.m.)

1                    **VOIR DIRE EXAMINATION**

2  **BY MR. ROYAL:**

3  **Q**    Agent Nichols, Page 1 of this exhibit appears to be a

4  different type of document than the other documents.  Were they

5  responsive to two different aspects of your subpoena?

6  **A**    No, sir.  This entire package is what the cable company

7  sent to me.

8  **Q**    Okay.  Page 1 has the IP address that you were inquiring

9  about; is that correct?

10  **A**    Yes.

11  **Q**    It does not have an account number, does it?

12  **A**    Page 1 does not.

13  **Q**    The remaining pages do not have the IP address, do they?

14  **A**    No.  They actually have the serial number for the device,

15  which is printed on Page 1.

16  **Q**    The serial number for?

17  **A**    The cable modem, which is printed on Page 1.  It's listed

18  as relay agent.

19  **Q**    The serial number -- oh, I see what you're saying.  Did

20  you give them the account number or did they give you the

21  account number?

22  **A**    I did not give them an account number.

23            **MR. ROYAL:**  Thank you.  I withdraw my objection.

24            **THE COURT:**  It's received as -- which one is it?

25            **MS. SMITH:**  Exhibit 4.

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                    11/1/2016

1          **THE COURT:**  Go ahead.

2               **DIRECT EXAMINATION, Continuing**

3   **BY MS. SMITH:**

4   **Q**    Okay.  Let's publish Page 1.  Special Agent Nichols, I

5   think you just testified about this.  Is this what Wide Open

6   West sent you?

7   **A**    Yes, that is one of the pages.

8   **Q**    And when you -- it has ana IP address of 69.14.117.120?

9   **A**    Yes.

10  **Q**    And what did you say the relay agent was?

11  **A**    The relay agent listed there.  They call those octets.  It

12  is the serial number of the cable modem device.

13  **Q**    And the cable modem device is a piece of equipment; is

14  that right?

15  **A**    Yes, that's the device that the actual cable connection

16  plugs into on one side, and then it provides Internet access

17  out the other side.

18  **Q**    Okay.  And the dates and times that you requested, were

19  they limited to the dates and times of the downloads of the

20  undercover session?

21  **A**    Yes, they were.

22  **Q**    All right.  Let's turn to Page 3 in this exhibit.  Is this

23  another document provided by WOW?

24  **A**    Yes, it is.

25  **Q**    And what does it show here, up in the upper left-hand

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                              11/1/2016

1    corner, who is the account assigned to?

2    **A**    Tommy Jones.

3    **Q**    All right.  And if we look -- thank you.  If we look in

4    the middle portion, what does this tell us?

5    **A**    So this gives us the subscriber's name, as well as the

6    address, gives a couple of different phone numbers, the last

7    four of the Social Security and a field there that says

8    "customer comment."

9    **Q**    And it lists an address of 26355 Annapolis Street,

10   Dearborn Heights, Michigan?

11   **A**    Yes, ma'am.

12   **Q**    It again says "Tommy Jones"?

13   **A**    It does.

14   **Q**    There's a customer type towards the bottom.  What does it

15   say, customer type?

16   **A**    It says "WOW employee."

17   **Q**    Okay.  Can we just zoom out to that page, please.

18        At the top third of the page, the top third again, it has

19   a status active date of is 11-30-09.  Do you know what that

20   means?

21   **A**    Yes.  That is the date that service began for that

22   customer.

23   **Q**    Okay.  You can take that down.  Thank you.

24        Additionally, as part of your investigation, did you look

25   into the Defendant's criminal history?

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1  **A**    Yes.

2  **Q**    And were you able to determine whether or not he had a

3  criminal history?

4  **A**    I was.

5  **Q**    And what did you discover?

6  **A**    I discovered that he was charged with a crime in Ohio

7  which he later pleaded guilty to.

8  **Q**    I'm going to turn you to Exhibit 16 in your book.  Do you

9  recognize that?

10 **A**    I'm sorry, did you say 16?

11 **Q**    16, Exhibit 16.

12 **A**    Yes, I do.

13 **Q**    I think there's a couple of documents in there.  Just

14 generally speaking, what are those documents?

15 **A**    These are certified court records from Cleveland, Ohio,

16 Cuyahoga County clerk.

17 **Q**    Did you obtain those certified court records?

18 **A**    I did not.

19 **Q**    But they were given to you by somebody in your office?

20 **A**    Yes.

21        **MS. SMITH:**  At this time, I move to admit Exhibit 16.

22 Your Honor.

23        **THE COURT:**  Any objection?

24        **MR. ROYAL:**  My position is on the record already,

25 your Honor.  I maintain that position.

Jury Trial-Vol.2                          11/1/2016

1              **THE COURT:**  It is, yes.  Subject to that objection,

2     they are admitted as Government 15.

3              **MS. SMITH:**  16.

4              **THE COURT:**  I said 15, didn't I?

5              **MS. SMITH:**  16, one-six.

6              **THE COURT:**  I think you've done both of them, but

7     I'll settle for 16.

8              **MS. SMITH:**  Thank you.  Can we publish the first

9     page, please.

10    **BY MS. SMITH:**

11    **Q**    All right.  So what is the jury looking at here?  Is this

12    one of the documents that you obtained?

13    **A**    Yes.

14    **Q**    And is this a charging document?

15    **A**    Yes, it appears to be a true bill or an indictment.

16    **Q**    Okay.  I just want you to read what's towards the bottom

17    where it says -- it begins "unlawfully," and then there's two

18    lines of typed text towards the bottom.  Do you see where it

19    begins with "attempted"?

20    **A**    Yes.

21    **Q**    Okay.  What does it say there?

22    **A**    "Unlawfully attempted to engage in sexual conduct with

23    Erica Jones, whose age at the time of the said sexual conduct,

24    was under 13 years, to wit, DOB 7-6-82."

25    **Q**    And what was the date on that?

Jury Trial-Vol.2                              11/1/2016

1   **A**     The date on this document -- it has a date of offense, is

2   that what you're looking for?

3   **Q**     Yes, please.

4   **A**     January 11, 1990 to August 23rd, 1990.

5   **Q**     Okay.  Let's go to the third page in those documents.  Can

6   you zoom into the text so I can make sure I'm looking at the

7   right one.

8           Can you read the first sentence please?

9   **A**     "The Defendant herein, having, on a former a day of court,

10  entered a plea of guilty to gross sexual imposition, RC

11  2907.05(a)(3) as amended in the indictment, was this day in

12  open court with his/her counsel present."

13  **Q**     And then does the text continue to say that the

14  Defendant -- that the Court inquired if the Defendant had

15  anything to say why judgment should not be pronounced, and

16  having nothing to say, he had already said and showing no good

17  and sufficient cause why the Defendant should not be

18  pronounced, that this is an order of judgment for a conviction

19  on this count; is that correct?

20  **A**     That's correct.

21  **Q**     Okay.  You can take that down.

22          How old was the Defendant at the time of this offense?

23  **A**     We looked into the -- I looked into the birthdate.  She

24  would have been probably eight years old when the offense began

25  and nine at the time of sentencing.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                              11/1/2016

1   **Q**    How about the Defendant?

2   **A**    He would have been approximately 20 years old.

3   **Q**    And through your investigation, did you come to learn that

4   the Defendant was related to this victim?

5   **A**    I did.

6   **Q**    How so?

7            **MR. ROYAL:**  Objection, that calls for hearsay.

8   There's no foundation for how this agent got this knowledge.

9            **THE COURT:**  You can ask the question how he knows.

10           **MS. SMITH:**  Thank you.

11           **THE WITNESS:**  So the victim was his little sister.

12  BY MS. SMITH:

13  **Q**    Okay.  And how did you learn that information?

14  **A**    I learned that through the Defendant himself.

15  **Q**    Thank you.  I'm going to direct your attention now to the

16  search warrant at 26355 Annapolis in Dearborn Heights,

17  October 23rd, 2015.  Were you involved in the execution of a

18  federal search warrant at this house?

19  **A**    Yes, I was.

20  **Q**    And what was the purpose for the search warrant?

21  **A**    The purpose of the search warrant was to search the house,

22  external storage buildings and vehicles for evidence of the

23  distribution, possession and receipt of child pornography.

24  **Q**    And what was your role that day?

25  **A**    I was the case agent.  So I guess that would make me the

1   organizer of the search.

2   **Q**    How many agents were there to execute the search warrant?

3   **A**    Again, this was a task force.  So it was a mix of agents

4   and other law enforcement personnel.  There were approximately

5   10 to 12 present.

6   **Q**    I'm sorry, I didn't mean to interrupt you.

7   **A**    That's okay.  I was finished.

8   **Q**    And is that an average number of law enforcement for a

9   typical search warrant?

10  **A**    Yes, it is.

11  **Q**    And did each person have a role to play that day?

12  **A**    Yes.

13  **Q**    What were some of the roles that you assigned?

14  **A**    So for the roles, we had an entry team, which was the team

15  that would clear the house and make sure there were no dangers

16  in there.  We had individuals assigned to take photographs of

17  the residence.  Individuals were assigned to search the

18  residence.  Individuals were assigned to conduct interviews,

19  and an individual was assigned to be the evidence custodian.

20  So he was the person that received all the evidence and created

21  a log of that evidence.

22  **Q**    Did you assign somebody to do a preliminary review of

23  media in the house?

24  **A**    Yes, I did.

25  **Q**    What time did you arrive that morning?

Jury Trial-Vol.2                         11/1/2016

1   **A**    It was approximately 6:45 a.m.

2   **Q**    Did you knock on the door?

3   **A**    I did.

4   **Q**    Did anybody answer?

5   **A**    No.

6   **Q**    So what did you do next?

7   **A**    So I guess to explain the situation, we had other members

8   of the search crew who were on what we call the perimeter.  So

9   they were on the sides of the house.  I asked if anybody heard

10  any movement or saw any lights.  The answer was no.  I knocked

11  again, announced "police, search warrant, open the door."  With

12  no response, I ordered one of our guys to force entry into the

13  residence.

14  **Q**    And was entry forced?

15  **A**    It was.

16  **Q**    When you entered the home, did you see any occupants?

17  **A**    Not at first.

18  **Q**    At what point did you see somebody?

19  **A**    So as the front door was open, I would have been the third

20  or fourth in a line of approximately five individuals.  The

21  doorway that we opened came directly into the living room.

22  Behind the living room was a kitchen, and between those two and

23  the entrances, mostly in the kitchen, was a stairway.  As we

24  rounded the corner, I observed Courtney Jennings coming up the

25  stairs.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                              11/1/2016

1   **Q**    Now, let's back up a minute.  What type of house is this?

2   **A**    I would describe it as a single story ranch with a

3   basement.

4   **Q**    How many bedrooms or rooms are on the first floor?

5   **A**    So on the first floor, when you walk in the door, there is

6   a living room.  Directly across from that is a kitchen.  Behind

7   the kitchen is what is probably a dining room but it was used

8   for storage.  To the right of that was a small short hallway.

9   There was a bathroom and two other what would be designed as

10  bedrooms on that side.

11  **Q**    How about the basement, how was the basement laid out?

12  **A**    So for the basement, the stairway of the basement led

13  through the kitchen.  So you would come down the kitchen stairs

14  onto a landing.  At the landing was a door that opened to the

15  outside to the driveway.  You made a turn to the right and that

16  would take you down the stairs.  Once you got to the bottom of

17  the stairs it opened up into a large room that was partially

18  finished.  There was a washer, a dryer machine down there, dog

19  food bowls.  To the right of that was a room that appeared to

20  be being used as storage room.  It had an aquarium, had what I

21  assumed were pet turtles.  There was a small corridor that led

22  between that room and another room, which was the bedroom of

23  the Defendant and Courtney Jennings.

24  **Q**    The rooms that had the aquarium and bedroom, they were

25  connected you said by a small passageway?

Jury Trial-Vol.2                           11/1/2016

1  **A**     Yes.  It was very small.  It was like a block had been

2  knocked out.  It was wide enough for me to walk through, but a

3  large man would have had trouble getting through it.

4  **Q**     And were there doors on any of these rooms?

5  **A**     Yes, there were exterior doors for both rooms.

6  **Q**     And did the doors have deadbolts on them?

7  **A**     They did.

8  **Q**     So in order to access either the room with the aquarium or

9  the bedroom or that little walkway through, if the doors were

10 locked, would one need a key to get in?

11       **MR. ROYAL:**  Well, I object to the leading question,

12 your Honor.  The testimony should come from the witness not

13 from the U.S. Attorney.

14       **THE COURT:**  Overruled.

15       **MS. SMITH:**  Thank you.

16 **BY MS. SMITH:**

17 **Q**     You can answer the question.

18 **A**     Yes, the doors appeared to lock from the inside so you

19 would either need to be inside the room to unlock the door or

20 have a key.

21 **Q**     All right.  Turning back to when you made entry into the

22 home.  You testified that Courtney Jennings came upstairs.

23 What happened with her at that point?

24 **A**     She came up.  She appeared distraught.  She was yelling at

25 us not to shoot her dog.  I called for Special Agent Lauren

Jury Trial-Vol.2                    11/1/2016

1   Williamson to speak with her.

2   **Q**   Why did you choose her?

3   **A**   Whenever we can, when we have a female on the task force,

4   we're going to have to do a protective sweep of the house

5   that's going to include a frisk of the individuals to make sure

6   they don't have a gun or knife or something that's going to

7   hurt us.  Where possible, if we have a female, I would prefer a

8   female agent to handle that duty.

9   **Q**   And was there anything physically different about her?

10  **A**   Yes.  We learned pretty quick that she was pregnant.

11  **Q**   All right.  And at some point did you see the Defendant?

12  **A**   I did.

13  **Q**   And what point did you see him?

14  **A**   So as Courtney was being talked to by Special Agent

15  Williamson, who had escorted her behind the five of us that

16  were making initial entry, I observed the Defendant coming up

17  the stairs carrying a cell phone.

18  **Q**   And what happened with the Defendant at that point?

19  **A**   At that point, the Defendant was ordered to place the cell

20  phone on the stove, which was right beside the stairs.  At that

21  point, another officer or agent talked to Mr. Jones.

22  **Q**   Okay.  Were the occupants -- these two occupants then,

23  where did they end up staying in the house during the search?

24  **A**   So at the beginning, I don't know exactly where they were.

25  However, once the house was cleared and I was back upstairs,

Jury Trial-Vol.2                           11/1/2016

1   they were seated on the couch.

2   **Q**    Were they allowed to move around during the execution of

3   the search warrant?

4   **A**    Absolutely not.

5   **Q**    Why not?

6   **A**    There's a couple reasons.  One is our primary goal is to

7   do a search warrant of the house.  So that means we're going to

8   look everywhere, because we're looking for small devices; we're

9   talking USB sticks, small SD cards.  We don't want the

10  occupants of the house to have an opportunity to move evidence

11  or perhaps take a piece of evidence that we wouldn't have found

12  and place it in a place we've already marked as searched.  So

13  that's one reason.  The other reason is strictly safety issues.

14  **Q**    Were they allowed to leave?

15  **A**    Absolutely.

16  **Q**    Did one your law enforcement members take pictures that

17  day?

18  **A**    Yes.

19  **Q**    I'm going to turn your attention to Exhibit 5 in the

20  exhibit book.  There are 17 pages to Exhibit 5.  Can you take a

21  look at those?  Do you recognize those?

22  **A**    Yes, these are the photos that were taken the morning of

23  October 23rd on the search.

24  **Q**    And do those photos fairly and accurately depict the scene

25  as you observed it on October 23rd, 2015?

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1    **A**    Yes.

2             **MS. SMITH:**  Your Honor, at this time I move to admit

3    Exhibit 5.

4             **MR. ROYAL:**  No objection.

5             **THE COURT:**  Any objection?

6             **MR. ROYAL:**  No objection.

7             **THE COURT:**  I receive Proposed Exhibit 5 for the

8    Government.

9             **MS. SMITH:**  Thank you.  I would like to publish some

10   of these pictures to the jury.

11            **THE COURT:**  You may.

12   **BY MS. SMITH:**

13   **Q**    All right.  Let's start with 135.

14        What are we looking at here?

15   **A**    This is the residence of the Defendant that we searched

16   that morning, the outside.

17   **Q**    And let's look at Number 2.

18        What are we looking at here?

19   **A**    This is the front bedroom of the house.  This is just

20   beyond the door we made entry through.  That is the Defendant

21   seated on the couch along with his stepdaughter, Courtney

22   Jennings.

23   **Q**    Number 3?

24   **A**    Number 3, this is the kitchen.  You can see to the left of

25   the photo some hands and the lower torso, maybe it's the leg

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                              11/1/2016

1    and arm area of one of our agents.  That is the stairs that

2    lead down to the basement.  Behind that is the door that opens

3    to the driveway.

4    **Q**    So that door on the left-hand side is an exterior door?

5    **A**    Yes, ma'am.

6    **Q**    If one were to go down that hallway and turn right, would

7    they be going down the basement?

8    **A**    Yes.

9    **Q**    And Number 4, what is this?

10   **A**    Number 4 is, again, the kitchen area.  Just beyond that is

11   what I believe is designed as a dining room area but it was

12   used for storage.

13   **Q**    Number 5?

14   **A**    Number 5 is another angle in that front living room area

15   that we made entry through, and again, seated on the couch is

16   the Defendant and his stepdaughter Courtney Jennings.

17   **Q**    Just for the record, are they in handcuffs?

18   **A**    No, they are not.

19   **Q**    Page 6.

20        What is the jury seeing here?

21   **A**    So Page 6 is depicting that room I described earlier.

22   That would be the first room behind a door that you would

23   encounter in the basement.  This is the room that appeared to

24   be used for storage and it had those turtles.

25   **Q**    Is that the aquarium you referred to earlier?

Jury Trial-Vol.2                          11/1/2016

1   **A**    Yes, it is.

2   **Q**    Page 7?

3   **A**    This is a photograph of one angle of the bedroom of the

4   Defendant and Courtney Jennings.

5   **Q**    And what's hung up on the wall there that's in the middle

6   of the picture?

7   **A**    That is a large TV or monitor.

8   **Q**    Okay.  And then towards the front middle part of this

9   picture, is there another screen there?

10  **A**    Yes, it appears to be a computer monitor.

11  **Q**    Okay.  Is that the bed over on the right-hand side?

12  **A**    It is.

13  **Q**    Number 8?

14  **A**    Number 8 is also a picture of the Defendant and Courtney

15  Jennings' bedroom taken from a different angle.

16  **Q**    And what do we see in the upper right-hand corner?

17  **A**    That is a television or large monitor that is displaying

18  the security cameras to the exterior of the home.

19  **Q**    Did your photographer take what are known as entry

20  pictures and exit pictures on this day?

21  **A**    Yes.

22  **Q**    What is a -- what are entry pictures mean?

23  **A**    Would it be okay if I outlined the process and how we do

24  these pictures?

25  **Q**    Yes.

Jury Trial-Vol.2                         11/1/2016

1    **A**     So when we make entry to a home, the first thing we do is

2    have our photographer take photographs.  Those photographs will

3    tell the outside the residence, to include the address if it's

4    affixed.  They will also take conditions of -- photos of

5    conditions of the house; so the shape it's when we made entry.

6    If we did any damage to the door, they'll document that.  Once

7    that's done, our search team will begin their search.  As the

8    search team finds items of interest that they think we should

9    collect as evidence, the photographer will come and take

10   photographs of those items in the place they were found.  Once

11   the search is complete, the photographer will take exit photos.

12   So again, he's documenting -- he or she -- the condition of the

13   house when we leave.

14   **Q**     And given the time stamp here, 7:58 a.m., is this what the

15   bedroom looked like before the search?

16   **A**     Time stamp says 6:58.

17   **Q**     I'm sorry, 6:58 a.m.

18   **A**     Yes, that is the time that the camera stamped on the

19   photo.

20   **Q**     Okay.  Next page, Number 9.

21   **A**     This is at the far end of the basement, depicts a storage

22   area.  There's a computer server there and a TV or monitor

23   hanging on the wall.

24   **Q**     Number 10?

25   **A**     Number 10 is that corridor I spoke about earlier that goes

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                      11/1/2016

1  between what we'll call the turtle room and the bedroom of the

2  Defendant and Courtney Jennings.

3  **Q**    All right.  What is at the top of this picture?

4  **A**    It's a TV or monitor.

5  **Q**    So in order to get through -- okay.  Are we looking at the

6  Defendant's bedroom in the blue paint?

7  **A**    Yes.

8  **Q**    And in order to get through that doorway, would somebody

9  have to bend over to get through?

10  **A**    I may not but someone else might, yes, ma'am.

11  **Q**    Okay.  And in between, we see somebody standing there on

12  the other side.  Are they standing in that room with the

13  aquarium?

14  **A**    Yes.

15  **Q**    I know it's hard to see in this picture, if one were to

16  take one step over that concrete wall that's been knocked out,

17  is there -- could they move to the left?

18  **A**    Yes, there is a very narrow space between the walls of

19  each room there.

20  **Q**    And just for the record, are those wires or network cables

21  that are hanging in that room?

22  **A**    Yes.  There were all types of wires between that -- those

23  two rooms.

24  **Q**    Picture Number 11, please.

25       And what are we looking at here?

Jury Trial-Vol.2                          11/1/2016

1   **A**    So in the previous picture, you asked if you turned left

2   if there was room back there.  This is a depiction of that

3   space between the two walls.

4   **Q**    Okay.  Approximately how wide is that?

5   **A**    It's not very wide.  I would estimate that it's maybe two

6   to three feet wide.

7   **Q**    And what are we looking at here?

8   **A**    Those are wires.  I mean it looks like there's network

9   wires there, perhaps power and cable, and some type of

10  electronic device.

11  **Q**    Okay.  Number 1, please.

12         What's this a picture of?

13  **A**    This is also that same room.  This is taken lower down

14  toward the floor.  The floor is actually at the bottom.  You

15  can see a trash bag there and there is a computer -- laptop

16  computer sitting on top of the trash bag.

17  **Q**    Let's move to Number 17.

18         What are why looking at here?

19  **A**    17 is the entryway into one of the upstairs bedrooms.

20  That would be the bedroom down the hallway and to the front

21  side of the house.

22  **Q**    At some point in the beginning of this search, did another

23  person arrive at the residence?

24  **A**    Yes, I had -- we had completed the clear of the search for

25  persons or weapons.  I went outside to a grab a notebook and

Jury Trial-Vol.2                              11/1/2016

1   take off some of the gear, and we had a Dearborn Heights police

2   unit there who waved me down and said that the wife of the

3   Defendant had pulled into the area.

4   **Q**    And what's her name?

5   **A**    Her name is Tiffany Jones.

6   **Q**    When you say take off some gear, what do you mean?

7   **A**    Well, I had a ballistic vest on, some other gear, just a

8   lot of stuff that the house was secure now that I didn't need.

9   **Q**    Is it normal -- standard procedure to wear a ballistics

10  vest when you execute a search warrant?

11  **A**    Absolutely, we've had even here in Detroit people shoot

12  through doors at us.

13  **Q**    What happened with Tiffany Jones?

14  **A**    So Tiffany Jones was stopped by the marked units.  They

15  were speaking to her.  They waved me over and I went over and

16  spoke with her myself and Special Agent Lauren Williamson.

17  **Q**    Okay.  Without you telling what she said or you said, did

18  she remain for the search of the house?

19  **A**    She did.

20  **Q**    And where was she during the remainder of the search?

21  **A**    I don't know exactly.  I know two of our task force

22  officers spoke with her, but I'm not sure where that

23  conversation happened.

24  **Q**    Were the occupants of the house asked to be interviewed

25  that day?

1  **A**    Yes.

2  **Q**    Did you perform some of those interviews?

3  **A**    Two of those interviews, yes.

4  **Q**    Who did you interview?

5  **A**    Myself and Special Agent Williamson interviewed the

6  Defendant as well as Courtney Jennings.

7  **Q**    All right.  Let's talk about your interview of the

8  Defendant.  Where did you take him for this interview?

9  **A**    So we did the interview in the, what I refer to as the

10  workout room.  It's that front bedroom we saw a photo of where

11  there was a treadmill just beyond the door.

12  **Q**    Did the Defendant agree to be interviewed?

13  **A**    Yes.

14  **Q**    Why would you take him in a different room?

15  **A**    Privacy, that's the main reason.  We don't want anyone

16  else in the house to hear what we're talking about.

17  Oftentimes, it makes the individual we are talking with more

18  comfortable.

19  **Q**    Okay.  Where was everybody sitting during this interview?

20  **A**    Special Agent Williamson and myself stood.  There really

21  wasn't any seating in there.  The Defendant sat on I can best

22  describe it as a weight bench.

23  **Q**    Did you have an opportunity to observe the Defendant's

24  demeanor?

25  **A**    Yes.

Jury Trial-Vol.2                              11/1/2016

1   **Q**    And how would you describe it?

2   **A**    He appeared calm, cooperative.

3   **Q**    Did you ask him where he worked?

4   **A**    I did.

5   **Q**    What did he say?

6   **A**    He said that he worked for Wide Open West and that he was

7   a service installation technician.  Basically, his job was to

8   go and perform service in and out of people's houses.

9   **Q**    Did he say -- did you ask him if he had Internet access at

10  his house?

11  **A**    I did.

12  **Q**    And what did he say about that?

13  **A**    He said that he had Internet access through to the house

14  and it was provided through Wide Open West.  He said that he

15  got a discount on it as an employee.  He also said that there

16  was wired Internet so physical wires, and he also said that

17  there was password-protected wireless Internet in the house.

18  **Q**    What is your understanding of password-protected wireless

19  Internet?

20  **A**    So my understanding of password-protected wireless

21  Internet is that it requires a password to connect to that

22  Internet.  Sometimes individuals who may not know what they're

23  doing set up their network as open and then anyone can connect

24  to it.  So when the Defendant tells me that the Internet --

25  wireless Internet is password protected, I take that to mean

Jury Trial-Vol.2                    11/1/2016

1    you require a password to connect to the Internet.

2    **Q**    Did you ask him about his activities on October 18th and

3    19th of 2015?

4    **A**    I did.

5    **Q**    And what, if anything, did he say?

6    **A**    He stated that he would have been home those evenings.  I

7    believe he -- well, he did.  He said that Tiffany Jennings as

8    well as Courtney Jennings were also home those evenings.

9    **Q**    Did he say whether anybody else was at the house those

10   nights?

11   **A**    He said those were the only three people home those

12   nights.

13   **Q**    Did you ask him which computer was his main computer?

14   **A**    Yes.

15   **Q**    And what did he say?

16   **A**    He said the Asus computer between the rooms by the

17   turtles.

18   **Q**    Did you in fact find the Asus computer in the room in

19   between the turtles?

20   **A**    Yes.  It was the laptop computer we saw in the picture

21   laying on the trash bag.

22   **Q**    Did you ask him about Ares peer-to-peer file sharing

23   program?

24   **A**    I did.

25   **Q**    And what, if anything, did he say about that?

1   **A**    He said that he used the Ares peer-to-peer file network

2   system to download child pornography.

3   **Q**    And did he admit that he downloaded child pornography as

4   well?

5   **A**    He did.

6   **Q**    Did you ask him how many times he downloaded child

7   pornography?

8   **A**    Yes.

9   **Q**    And what was his answer?

10  **A**    Less than 100 times.

11  **Q**    Did you ask him if you would find child pornography on

12  that laptop computer?

13  **A**    Yes.

14  **Q**    And what was his answer?

15  **A**    He said that we probably would find child pornography on

16  that computer.  He said that he moved some of those images or

17  videos to another folder on that computer to prevent people

18  from downloading them from him and to delete them.

19  **Q**    He said he intended on deleting the files?

20  **A**    Yes.

21  **Q**    But he said he moved them to another folder?

22  **A**    Yes.

23  **Q**    How long was this interview?

24  **A**    I would estimate approximately 20 to 30 minutes.  It was

25  very short.

Jury Trial-Vol.2                        11/1/2016

1    **Q**    After that interview was over, did you ask him to

2    accompany you to the downtown Detroit FBI office for a second

3    interview?

4    **A**    Yes.

5    **Q**    And did he agree?

6    **A**    He did.

7    **Q**    And what happened next?

8    **A**    So at that point, I asked him if he needed to get some

9    breakfast or brush his teeth or change clothes.  He indicated

10   that he would like to brush his teeth and change clothes.  So I

11   went out to make some phone calls and one of our other officers

12   or agents assisted him in locating his clothes and brushing his

13   teeth.

14   **Q**    Was he under arrest at that point?

15   **A**    No.

16   **Q**    I'm going to direct your attention to the interview at the

17   FBI building in Detroit.  Approximately how long was the drive

18   there?

19   **A**    Depending on traffic it's 20 to 25 minute drive.

20   **Q**    Were you in the car with the Defendant?

21   **A**    Yes.

22   **Q**    Who else was in the car with him?

23   **A**    Special Agent Lauren Williamson.

24   **Q**    And did the Defendant engage in conversation during this

25   ride?

Jury Trial-Vol.2                          11/1/2016

1   **A**    Absolutely.

2   **Q**    Just generally, what was the topic of conversation?

3   **A**    It was a friendly conversation.  It wasn't about what was

4   going on at the house.  We talked about a lawsuit that involved

5   his mother, I believe, and a hospital.  We talked about

6   traffic.  We talked about a dangerous intersection there in

7   Taylor.  It was just very -- not related to the case at all.

8   **Q**    What was his demeanor like?

9   **A**    Again, he was calm and seemed cooperative.

10  **Q**    When you arrived at the FBI in Detroit, did you get him

11  something to eat and drink?

12  **A**    Yes.

13  **Q**    What was that?

14  **A**    It was two bottles of water and a granola bar that I

15  bought out of our pantry.

16  **Q**    Did you take him to meet Special Agent Michael Fitzgerald?

17  **A**    Yes.

18  **Q**    Was the purpose of that meeting for the second interview?

19  **A**    Yes, it was.

20  **Q**    Was the Defendant advised of his what are sometimes known

21  as Miranda rights at that time?

22  **A**    Yes.

23  **Q**    Was he under arrest at that point?

24  **A**    No.

25  **Q**    Who else was in -- strike that.

Jury Trial-Vol.2                                    11/1/2016

1          Did you witness him being read his rights?

2    **A**    I did.

3    **Q**    I'd like you to turn to Exhibit 17.  Do you recognize

4    that?

5    **A**    Yes.

6    **Q**    What is that?

7    **A**    That's a form we refer to as an FD395.  It's an FBI advice

8    of rights form.  It's commonly known as the Miranda rights.

9    **Q**    And does it have the Defendant's signature on it?

10   **A**    Yes.

11   **Q**    Did you witness the signature?

12   **A**    I did.

13          **MS. SMITH:**  Your Honor, at this time I move to admit

14   Exhibit 17.

15          **THE COURT:**  Any objection?

16          **MR. ROYAL:**  My position is on the record, your Honor.

17          **THE COURT:**  All right.  Subject to what's on the

18   record, it's accepted as Government 17? 16?

19          **MS. SMITH:**  17.

20          **THE COURT:**  17.

21          **MS. SMITH:**  Only Exhibit 17.  Correct.

22   BY MS. SMITH:

23   **Q**    Did you witness him being administered these rights?

24   **A**    I did.

25   **Q**    How were they administered?

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1  **A**     Special Agent Fitzgerald handed him a piece of paper that

2  reads exactly like this.  The FD395 was a physical copy.  He

3  asked Mr. Jones, the Defendant, to read it aloud, which the

4  Defendant did do.

5  **Q**     After those advice of rights were administered, did you

6  leave the room?

7  **A**     After the Defendant signed the form electronically, yes, I

8  did.

9  **Q**     At some point, did Special Agent Fitzgerald come and get

10  you to come back in the room?

11  **A**     He did.

12  **Q**     And what happened when you got back in the room?

13  **A**     Special Agent Fitzgerald summarized statements that the

14  Defendant had made in his presence.

15  **Q**     And who was present for that?

16  **A**     Special Agent Fitzgerald, Special Agent Williamson, myself

17  and the Defendant.

18  **Q**     And what was the Defendant doing while this agent

19  summarized the interview?

20  **A**     He was sitting there listening, not objecting.

21  Occasionally he would nod in agreement.

22  **Q**     After this second interview, what happened with the

23  Defendant?

24  **A**     He was placed under arrest.

25  **Q**     And what -- how was the decision made to place him under

Jury Trial-Vol.2                          11/1/2016

1   arrest?

2   **A**    I contacted the United States Attorney's office.

3   **Q**    And did you receive authorization to arrest him at that

4   point?

5   **A**    I did, through a way of a criminal complaint and federal

6   arrest warrant.

7   **Q**    And approximately what time of day was that on

8   October 23rd?

9   **A**    Are you asking when he was arrested?

10  **Q**    Correct.

11  **A**    Approximately 2:30 p.m.

12  **Q**    And did you take him to the -- where did you take him?

13  **A**    Special Agent Williamson and myself took him to the United

14  States Marshals in downtown Detroit.

15  **Q**    Did you frisk him before you took him downtown?

16  **A**    Yes, before we left.

17  **Q**    And what, if anything, did he have on him?

18  **A**    He had a Michigan driver's license, approximately $640 in

19  cash and what appeared to be a house key.  It had a Detroit

20  Tigers logo on it.

21           **MS. SMITH:**  One moment, please.

22           No further questions at this time, your Honor.

23           **THE COURT:**  And for the Defendant.

24           **MR. ROYAL:**  Thank you, your Honor.

25                                           (11:47 a.m.)

Jury Trial-Vol.2                              11/1/2016

1                         **CROSS EXAMINATION**

2    **BY MR. ROYAL:**

3    **Q**    Good morning, Agent Nichols.

4    **A**    Good morning.

5    **Q**    You indicated that you attended the FBI academy at

6    Quantico, Virginia; is that correct?

7    **A**    That's correct.

8    **Q**    And you graduated I think you said in 2012?

9    **A**    Also correct.

10   **Q**    And at that time, you were sworn in as a special agent; is

11   that correct?

12   **A**    Well, it's -- they swear you in at the beginning and then

13   at the end as well, but yes, that's correct.

14   **Q**    Special agent is a rank, it's sort of like the title

15   police officer; is that correct?

16   **A**    It is, yeah.

17   **Q**    I mean everybody, every agent who graduates from the

18   academy and joins the FBI is called a special agent, correct?

19   **A**    If they graduate as the -- from the new agent programs,

20   yes.

21   **Q**    And so it's not like you had to serve for some period of

22   time and then you were promoted to special agent, you've always

23   been a special agent since you've been with the FBI; is that

24   correct?

25   **A**    That's correct.

Jury Trial-Vol.2                    11/1/2016

1    **Q**    And during the time that you were at Quantico, you took a

2    number of classes in law enforcement; is that correct?

3    **A**    Yes.

4    **Q**    And you also received some training in how to testify in

5    court; is that correct?

6    **A**    We did, yes.

7    **Q**    And you're trained to -- in fact you went through

8    rehearsal sessions at the academy on practicing how to testify;

9    is that correct?

10   **A**    Yes.

11   **Q**    And you're trained to dress professionally; is that

12   correct?

13   **A**    I don't think anyone needs to be trained to dress

14   professionally.  That's not one of the topics, but we are

15   trained in multiple different things.

16   **Q**    And you're trained to get eye contact with the members of

17   the jury; is that correct?

18   **A**    Sure.

19   **Q**    And you're trained to familiarize yourself with your

20   testimony so you don't have to refer to documents during the

21   actual testimony; is that correct?

22   **A**    That's correct, yes.

23   **Q**    And since you received -- and you're trained to look calm

24   and relaxed and very professional; is that correct?

25          **THE COURT:**  Excuse me.

Jury Trial-Vol.2                              11/1/2016

1          **MR. ROYAL:**  Thank you, your Honor, could I just have

2     a moment?

3          **THE COURT:**  This is presumably related to

4     sequestering witnesses.  You may continue, Mr. Royal.

5          **MR. ROYAL:**  Thank you, your Honor.  I apologize for

6     the interruption.

7     **BY MR. ROYAL:**

8     **Q**     And in addition to that, since you graduated from the

9     academy, you've testified in court on a number of occasions

10    since 2012; is that correct?

11    **A**     That's correct.

12    **Q**     So you've got experience in how to be comfortable and

13    testify in a professional manner; is that correct?

14    **A**     Yes, sir.

15    **Q**     Okay.  Now, you've referred to the IP address, and I'm

16    trying to understand that.  The IP address is unique to an

17    account or is it unique to a piece of equipment?

18    **A**     For -- and we're talking specifically about for Wide Open

19    West.  That IP address is going to be on the public side of the

20    cable modem device installed at the service address.

21    **Q**     So no matter what happens to that account, it's your

22    understanding that the IP address would remain the same?

23    **A**     No.

24    **Q**     As long as the cable modem is intact?

25    **A**     No.

Jury Trial-Vol.2                              11/1/2016

1   **Q**    That's not correct?

2   **A**    That's right.

3   **Q**    Could you explain it to me?

4   **A**    So IP addressing works on a couple of different methods.

5   One of those is called DHCP, and that is generally what's used

6   for residential services.  The other is a static address, and

7   that is an IP address that never changes.  So for residential

8   addresses, that address can change.

9   **Q**    So what would cause it -- even though the cable modem box

10  remains the same, the IP address could change?

11  **A**    Yes, sir.

12  **Q**    And do you have any idea what would cause it to change?

13  **A**    Absolutely.

14  **Q**    What?

15  **A**    So DHCP is access.  This is a server, and so the cable

16  modem device or a computer or a cell phone would say, hey, I

17  need an IP address -- and I'm oversimplifying this of course.

18  That server would then assign an IP address for a specific

19  amount of time that's called DHCP lease.  Once that lease

20  expires, that device will request to retain that IP address.

21  Sometimes that happens and sometimes it doesn't.

22  **Q**    Okay.  So that's something that's done by the Wide Open

23  West company?

24  **A**    Correct.

25  **Q**    And what if someone is late paying their bill and they get

```
 1    a -- and their equipment is shut off, would that generate the

 2    change in the IP address?

 3    A    Well, if it was shut off, it shouldn't have an IP address.

 4    Q    No. I'm saying -- suppose they did pay the bill and it got

 5    turned back on, would it have a different IP address at that

 6    point?

 7    A    I don't know how they do their system, but certainly

 8    could.

 9    Q    Did you ever subpoena records from Wide Open West to see

10    when that IP address had last changed prior to October 23rd?

11    A    Not specifically.  In the response, it shows how long that

12    particular IP address had been assigned to that residence.

13    Q    And does that show in one of the exhibits that we've

14    looked at?

15    A    Yes.  It was Page 1 that you asked me about earlier.  It's

16    on Page 1.

17    Q    So what's your understanding of when that IP address went

18    into effect?

19    A    I would have to look at that Page 1 to be sure.

20    Q    Okay.  Could you do that, please?

21    A    Yes, sir.  Do you remember the exhibit?

22    Q    I think it's 4.

23    A    Yes, sir.  I have it here.

24    Q    So that page says "lease," is that a reference to the IP

25    address being leased?
```

Jury Trial-Vol.2                         11/1/2016

1  **A**     Correct, yes, sir.

2  **Q**     And this indicates that the IP address started on

3  September 14th, 2015 and ended on October 20th, 2015; is that

4  correct?

5  **A**     That's correct.  And the end time there is not necessarily

6  indicative of the time it ended, but that's the cutoff for the

7  subpoena that I sent.  They didn't give me information past

8  that date.

9  **Q**     Past October 20th?

10  **A**     Correct.

11  **Q**     But the IP address started being operational on

12  September 14th?

13  **A**     Yes, in relation to this specific cable modem referenced

14  by this relay agent.  So the serial number, yes, sir.

15  **Q**     And is that why the indictment reads, "Starting on

16  September 14, 2015 --

17           **MS. SMITH:**  Objection, your Honor.  It's not

18  relevant, and the witness cannot testify to what the

19  indictment -- why the indictment was crafted in a certain way.

20           **THE COURT:**  I don't -- as capable as Agent Nichols

21  is, I don't think we want him to have an opinion with regard to

22  what the indictment says or doesn't say.

23  **BY MR. ROYAL:**

24  **Q**     Well, Agent Nichols, you agree that the indictment in this

25  case does set forth a time period; is that correct?

Jury Trial-Vol.2                         11/1/2016

1   **A**    Yes, my understanding, it does set forth a certain time

2   period.

3   **Q**    I'm sorry?

4   **A**    Yes.

5   **Q**    And that time period begins September 16th, 2015; is that

6   correct?

7   **A**    I would have to look at the indictment.  I don't know what

8   the time period is.

9   **Q**    Okay.  Well, you testified before the grand jury; is that

10  correct?

11  **A**    I did.

12          **MR. ROYAL:**  May I approach, your Honor?

13          **THE COURT:**  You can.

14  **BY MR. ROYAL:**

15  **Q**    Handing you a copy of the first superseding indictment in

16  this case.

17          **THE COURT:**  What is it you're having him look at?

18          **MR. ROYAL:**  The first superseding indictment.

19          **THE WITNESS:**  And what --

20  **BY MR. ROYAL:**

21  **Q**    Is that correct, that the period charged in the indictment

22  begins on September 16th, 2015?

23  **A**    I would assume so.  It's listed in the indictment, sir.

24  **Q**    Now, as I understand your testimony, when you were taking

25  these screen shots on October 18th and 19th, 2015, you were not

Jury Trial-Vol.2                                11/1/2016

 1    communicating with another human being directly; is that

 2    correct?  This was not like a chat room, was it?

 3    **A**    That's correct.

 4    **Q**    Okay.  So under the Ares system, correct me if I'm wrong,

 5    but as I understand your testimony, the Ares system, you

 6    identified a shared folder that you thought would contain child

 7    pornography; is that correct?

 8    **A**    Well, not necessarily.  I identified a device that was

 9    sharing files of interest, which again were likely child

10    pornography.

11    **Q**    And you went into that shared folder to see what was in

12    there; is that correct?

13    **A**    Yes, that shared folder was open to the Internet, to

14    everyone, so yes.

15    **Q**    So anyone who had access to the Ares system could access

16    that shared folder; is that your testimony?

17    **A**    Yes, sir.

18    **Q**    And you looked at what was in that shared folder; is that

19    correct?

20    **A**    That's correct.

21    **Q**    So but you were not asking someone for permission to look

22    at those folders or to make copies of them, you were just doing

23    that; is that correct?

24    **A**    That's right.  I don't have to ask permission for

25    something that's open.

Jury Trial-Vol.2                          11/1/2016

1  **Q**    Well, I'm not saying you did have to have it.  I'm saying

2  in fact you didn't communicate with any person about what was

3  in that shared folder; is that right?

4  **A**    No, I didn't.

5  **Q**    And so you referred to the times that are generated on

6  your the screen shots that you took.  So you -- so for example,

7  on Exhibit 1A, you listed a time as 18 -- I'm sorry, the time

8  as 22:48:12?

9  **A**    I'm sorry is this 1A, you said?

10 **Q**    1A, correct, the first one.

11 **A**    Okay.  I have it here.

12 **Q**    Now, translating that into real time here in the Eastern

13 District of Michigan, are you saying that to get the time here,

14 I'd have to deduct four hours from that time?

15 **A**    For this time of the year, yes, sir.

16 **Q**    It was that same time of year that you did this

17 investigation?

18 **A**    Yes, correct.

19 **Q**    So the actual time at the time you took this screen shot

20 would have been 22 minus 4 or 18:42:12 is that correct?

21 **A**    Yes.

22 **Q**    Which would be 6:48:12 p.m.?

23 **A**    18, would be -- yes, 6:48:12.

24 **Q**    That would hold true for all the times, that they would --

25 to get the actual time, local time, you'd have to deduct four

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                                   11/1/2016

 1  hours from it?

 2  **A**    That's correct.  And then of course if you don't

 3  understand the 24-hour clock, you'd have to compensate for

 4  that, but yes, you're right.

 5            **MR. ROYAL:**  Could we put 1A up on the screen, please?

 6  **BY MR. ROYAL:**

 7  **Q**    All right.  Now, the notation in the bottom right-hand

 8  corner with your name and date and time on it, that's not

 9  something that you saw on the computer screen that's something

10  you added to this exhibit; is that correct?

11  **A**    No, I didn't add it.

12  **Q**    Okay.  So how did it get onto the screen in the computer?

13  **A**    Well, as I talked about earlier, we use a specific law

14  enforcement tool and it takes screen shots as we're

15  downloading, by the software itself.  So the software

16  superimposes that on there at the time it takes the screen

17  shot.

18  **Q**    Okay.  So the software you're using superimposes that

19  information on the screen shot, correct?

20  **A**    At the time it takes the screen shot, yes.

21  **Q**    But the rest of the screen is something that came off of

22  the Internet; is that correct?

23  **A**    I'm sorry?  I don't understand what you're asking.

24  **Q**    Okay.  Other than -- there's nothing on the screen that

25  came from your software, other than your name and the date and

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                            11/1/2016

1   time in the bottom right-hand corner; is that correct?

2   **A**    No.  This is the screen shot of my software.

3   **Q**    Okay.  But the screen shot -- okay.  So you're saying

4   because of your software you can get the data off the Internet

5   and put it into this format; is that correct?  Is that what

6   you're saying?

7   **A**    I still don't understand what you're asking.

8   **Q**    I'm saying that suppose someone is not using your

9   software, would they be able to get the same screen up without

10  your name and address and the name and the date and time on it?

11  **A**    No.

12  **Q**    So your software is specially designed to put the data

13  into this format?

14  **A**    Right.  So as you look at this, you see in the top left

15  corner, it says LE1.03, and that indicates the version of the

16  law enforcement software we're using.  Now, this thing is

17  similar in that it has similar tabs to what we saw, but they

18  are completely different from the commercially available Ares

19  program.

20  **Q**    So someone who did not have the software would see some of

21  this data but in a different format --

22  **A**    They would --

23  **Q**    -- if they went into that shared file folder?

24  **A**    This is only depicting the download of that file from that

25  folder.  So if they were to do that download and they were to

Jury Trial-Vol.2                                11/1/2016

1   go to their software to the transfers tab, they would see

2   similar fields.  So they would see the name of the file.  They

3   probably wouldn't see the hash.  They would see, possibly, the

4   user they're downloading it from if it was -- there was only

5   one user if it was a super unique file.  They may see multiple

6   users there.  If it's downloading from multiple users, you

7   would see a drop down underneath that where it says anon_ 450E,

8   and that would have all the users listed and the parts of the

9   file as they were being downloaded as a status board.

10  **Q**     All right.  Now, in this shared folder that you were in --

11  and you told us that it's common among people who are involved

12  in child pornography, that if you want to get something you

13  have to give something?

14  **A**     That's correct.

15  **Q**     Okay.  You didn't give anything in exchange for these

16  files that you downloaded, did you?

17  **A**     No, I didn't.

18  **Q**     Okay.  There was nothing on this shared folder that

19  invited you to make copies of what's in that folder, was there?

20  **A**     I'm sorry?

21  **Q**     There was nothing written in this shared folder that said

22  "help yourself" or "this is yours for the taking" or invited

23  people to make copies and download these files; is that

24  correct?

25  **A**     That's the very purpose of the software is to invite

Jury Trial-Vol.2                                    11/1/2016

1    people to download files.

2    **Q**    Well, that's your assumption?

3    **A**    No, that's the way the software is set up, sir.

4    **Q**    But there's nothing written in the shared file that

5    says -- that invites people to take anything, is there?

6    **A**    You mean like a note?

7    **Q**    Yes.

8    **A**    No.

9    **Q**    Okay.  And when you downloaded this, you didn't leave any

10   note saying "thanks for the software" or "I downloaded your

11   files" or anything like that, did you?

12   **A**    No, I didn't.

13   **Q**    So the person who operates the shared folder would have no

14   way of knowing that you had come in and copied any of those

15   files; is that correct?

16   **A**    Sure, they would.

17   **Q**    How would they know?

18   **A**    Well, all they have to do is look in their transfers tab

19   for files that had been uploaded.

20   **Q**    And that would say somebody had made a copy of their file?

21   **A**    Yes, it would.

22   **Q**    Now...

23             **THE COURT:**  As long as we're taking a break --

24             **MR. ROYAL:**  I'm sorry, your Honor?

25             **THE COURT:**  As long as we are taking somewhat of a

Jury Trial-Vol.2                          11/1/2016

1    pause here, Mr. Royal, let me say that I've been holding my

2    tongue to a certain extent to keep from saying to you, "You're

3    going to do a proffer on why this is relevant to this jury."

4    And that was especially true of all of the times you wanted to

5    get earlier on, and I didn't interrupt you, but if that's

6    relevant, I don't know how it is relevant to what the jury has

7    got to decide in this case, and I think we're into that area,

8    again, where the witness has been very knowledgeable and has

9    been very forthcoming, but I don't think your questions are

10   relevant to what the jury has to decide.  I've said that, and

11   I'll let you go ahead, but please keep that in mind.

12           **MR. ROYAL:**  If the Court would like to meet with us

13   at sidebar, I would be happy to explain my purpose.

14           **THE COURT:**  If the Court what?

15           **MR. ROYAL:**  If the Court would like to meet with us

16   at sidebar, I would be happy to explain my purpose.

17           **THE COURT:**  No, I'm not going to meet with you at

18   sidebar.

19   **BY MR. ROYAL:**

20   **Q**    Now, Mr. Nichols, you prepared a two-page report

21   concerning the activity you described on August 18th and 19th;

22   is that correct?

23   **A**    I'm not sure of the number of pages.  Two sounds right,

24   yes.

25   **Q**    And that's dated October 20th, 2015; is that correct?

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                                11/1/2016

1   **A**    I would have to look at it to verify the date, but that

2   sounds correct again.

3              **MR. ROYAL:**  May I approach witness, your Honor?

4              **THE COURT:**  You may.

5   BY MR. ROYAL:

6   **Q**    Agent Nichols, is that a copy of your report regarding

7   these investigative activities?

8   **A**    Yes, sir, it is.

9   **Q**    Okay.  Now, you prepared this report while these events

10  were fresh in your mind; is that correct?

11  **A**    Yes, that was the next day.

12  **Q**    On October 20th?

13  **A**    Correct.

14  **Q**    Now, in part of this report, there's a reference to

15  Sunday, October 18th, between 19:52 and 19:59 hours.  Is that a

16  reference to actual time or is that a reference to the

17  universal time that you referred?

18  **A**    Everything in this report where there appears to be a

19  time, it's going to be in UTC time.

20  **Q**    So you'd have to subtract four hours to get local time?

21  **A**    Correct -- well, yes, correct.

22  **Q**    At that time of year?

23  **A**    Yes.

24  **Q**    And according to this report, between those times of 19:52

25  and 19:59, you downloaded one file, the Goldberg file; is that

Jury Trial-Vol.2                           11/1/2016

1    right?

2    **A**    Well, that's -- so in this report, I only listed the

3    complete downloads.  So yes, I downloaded that file completely

4    on that date and time.

5    **Q**    But your report doesn't say that you were only listing

6    complete files, does it?

7    **A**    Successfully downloaded from the subject computer, that is

8    what that means.

9    **Q**    So you're saying that when it successfully downloaded,

10   that means you feel you got the entire video?

11   **A**    It's not that I feel, it's that I got the entire video.

12   **Q**    There's nothing in this report that says that any of these

13   files were being advertised or offered to anyone else; is

14   there?

15   **A**    Specifically states right there in the second paragraph

16   that this was a candidate for 24 files of investigative

17   interest, which means that they were publicly shared and

18   available for anyone on the Internet using the Ares software.

19   **Q**    So my question is your report doesn't say that these files

20   are being advertised or offered?

21   **A**    If you're asking if I used the word "advertised," I did

22   not.

23   **Q**    Now, you've indicated that you were in charge of the --

24   during the search of the house in Dearborn Heights, there was a

25   lot of computer equipment that was seized by you and your

Jury Trial-Vol.2                          11/1/2016

1   fellow agents; is that correct?

2   **A**    Yes, sir.

3   **Q**    And you found that this house was protected by a number of

4   outside security cameras that were directed towards people who

5   might approach the house from outside; is that correct?

6   **A**    That's correct.

7   **Q**    And one of the pictures we saw showed a screen with nine

8   smaller screens which were recording information from those

9   security cameras; is that correct?

10  **A**    Yes.

11  **Q**    And that security system was seized by you and your fellow

12  agents; is that right?

13  **A**    Someone there at the scene did seize that piece of

14  evidence, yeah.  There were actually two video recorders.

15  **Q**    There was what?

16  **A**    There were two DVRs for those computers.

17  **Q**    Okay.  And so the material that had been recorded for

18  those cameras was seized along with the cameras and the screen

19  inside?

20  **A**    Right.  Assuming that video recordings were on those

21  devices, they would have been taken along with the device.

22  **Q**    And did you view those videos on the security cameras?

23  **A**    Yes, sure did.

24  **Q**    And did you erase them prior to returning that equipment?

25  **A**    I did not.

Jury Trial-Vol.2                               11/1/2016

1    **Q**    Do you know if anyone did?

2    **A**    I was the only person to look at those and if I didn't do

3    it, no one else would have.

4    **Q**    So your -- it's your position that whatever -- did you

5    find that video had been recorded on the security system?

6    **A**    Yeah, I found that video was recorded on it.  The times

7    were way off.  It wasn't relevant to the case and I returned

8    it, along with 30 or 40 other items that weren't relevant.

9    **Q**    Did those security videos show you and your fellow agents

10   approaching the house in the process of executing the search

11   warrant?

12   **A**    I believe they did, yeah.

13   **Q**    But what you're testifying is that as far as you know,

14   though, that system was returned intact and whatever was on it

15   when you had it should have been on it when it was returned?

16   **A**    Right.  I gave it back to Tiffany Jones in the exact

17   manner we took it.

18   **Q**    Okay.  And you also returned a number of other computer --

19   a bunch of computer equipment that you found irrelevant to the

20   case; is that right?

21   **A**    Right.  And again, I don't recall what those exact items

22   were, but there were a multitude of items that were returned.

23   **Q**    Now, I'd like to go through the scene photographs, Exhibit

24   5, and ask you a few questions about them.

25   **A**    You said Exhibit 5, sir?

Jury Trial-Vol.2                              11/1/2016

1    **Q**    Yes.

2    **A**    Okay.  I have it.

3    **Q**    Okay.  The first photograph, which has the number 135 at

4    the bottom is the outside view of the front of the house; is

5    that correct?

6          Could we put that up on the screen, please?

7          It shows the outside of the house from the front; is that

8    correct?

9    **A**    Yes, sir.

10   **Q**    Is that before or after you began to execute the search

11   warrant?

12   **A**    That is after we have cleared the house.

13   **Q**    And that shows my client, Tommy Lee Jones', service van at

14   the right with the WOW insignia on the side; is that correct?

15   **A**    Yes.

16   **Q**    And then the second picture -- can we show 138, please.

17         That's the living room of the house; is that correct?

18   **A**    Yes.

19   **Q**    The front door that you gained access to would have been

20   at the lower right-hand level out of view of that picture; is

21   that correct?

22   **A**    No.  It would be to the lower left side of that picture

23   out of view.

24   **Q**    Okay.

25   **A**    It would be just to the side of this couch there.

Jury Trial-Vol.2                    11/1/2016

1   **Q**    And is the lighting in there the same type of lighting

2   that was on when you were in there with my client and his

3   stepdaughter?

4   **A**    I don't believe that the front room was illuminated when

5   we first made entry.  That was probably turned on after.

6   **Q**    Okay.  And my client and his stepdaughter remained on that

7   couch for several hours as you and your fellow agents performed

8   that search; is that correct?

9   **A**    No.  Maybe Courtney did.  I don't know, I wasn't there,

10  but the Defendant was not on that couch for several hours.

11  **Q**    And you're talking about the time you took him out to

12  interview him, is that the difference?

13  **A**    So the interview would have began very early.  Again, we

14  left the house at 8:30 to come back to the office for that

15  second interview.  We're taking entrance photos at just a

16  little before 7:00.  So at the most, he would have been on that

17  couch for 30 or 40 minute.  Again, with Courtney, I don't know

18  how long she sat there.

19  **Q**    All right.  And looking at picture 140, please.

20       That shows the kitchen stove; is that correct?

21  **A**    Yes.

22  **Q**    And where you directed -- well, were you the agent who

23  directed my client to put his cell phone on the stove?

24  **A**    No.  That would have been one of the first two agents

25  inside the house.  Again, I was third or fourth.

USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                          11/1/2016

1   **Q**    Okay.  But you heard that?

2   **A**    Yep, I heard that.

3   **Q**    So is this a stove Mr. Jones was directed to put his cell

4   phone on?

5   **A**    Yes, it's the only stove there.

6   **Q**    And he did so as directed; is that correct?

7   **A**    That's correct.

8   **Q**    And there were firearms directed at him when he was told

9   to do that; is that correct?

10  **A**    I don't know.  I mean the standard is when we enter a

11  house like that, we will have firearms drawn.  Again, it's not

12  my job to pay attention to the first two people.  My job is to

13  look straight and cover any area where an adversary could come

14  from.  So I would assume that yes, but I can't say whether or

15  not they did.

16  **Q**    Well, was your gun drawn?

17  **A**    Absolutely.

18  **Q**    And could we have picture 158, please.

19         That's another picture of my client and the stepdaughter,

20  Courtney Jennings, sitting on the couch in the living room; is

21  that correct?

22  **A**    Yes, sir.

23  **Q**    And the front door of the house would be to the right out

24  of the margin of this picture; is that right?

25  **A**    Yes, sir.  You can see just the edge of the trim of the

Jury Trial-Vol.2                                    11/1/2016

1   door there.

2   **Q**    All right.  Now, you indicated that you were involved in

3   the interview of Courtney Jennings; is that correct?

4   **A**    That's correct.

5   **Q**    And she was also taken to the what I call the exercise

6   room, that had the weight bench and other exercise equipment;

7   is that correct?

8   **A**    That's correct.

9   **Q**    And she was in there with you and Agent Williamson; am I

10  right?

11  **A**    Yes, sir.

12  **Q**    And you had an opportunity, during all the time you were

13  there, to have ample ability to observe Courtney Jennings as

14  she appears as a human being; is that correct?

15  **A**    Yes, sir.

16  **Q**    You got a good look at her?

17  **A**    I was with her for 20 or 30 minutes.

18  **Q**    Okay.  And you would recognize her if you saw her again;

19  is that correct?

20  **A**    I think so, yes.

21       **MR. ROYAL:**  Your Honor, I'd ask permission to bring

22  Courtney Jennings in the courtroom for purposes of an in-court

23  identification.

24       **MS. SMITH:**  Your Honor, I object.  I don't see how

25  this is relevant.

Jury Trial-Vol.2                              11/1/2016

1           **THE COURT:**  I don't understand what you're doing, but

2    you're not cross examining.  You've got this Miss Jennings some

3    place and you'd like to bring her?

4           **MR. ROYAL:**  Correct.

5           **THE COURT:**  We're not going to do that here.

6           **MR. ROYAL:**  It goes to the examination of this

7    photograph that we've talked about that I next want to show the

8    jury.

9           **THE COURT:**  If you've got control and direction of

10   Miss Jennings, you can do it when do you your case, unless the

11   Government wants to go ahead and do it now.

12          **MS. SMITH:**  No, I object.  This is beyond the scope

13   of the direct examination and it's not relevant.

14          **MR. ROYAL:**  The point is I cannot during my case show

15   Miss Jennings to Agent Nichols.  I would like to show her to

16   him because I want to ask him if he can identify her.  I don't

17   want --

18          **THE COURT:**  It's like a lot of other things you're

19   doing, Mr. Royal.  It's very hard, in some cases impossible,

20   for this judge to understand what you're eliciting in testimony

21   and why it has anything to do with this case.  Now, that's not

22   everything, but that's a lot of things, and in this case,

23   Miss Jennings and what you're going to do with her is one of

24   those questions, and if you have something that's really

25   relevant and you can proffer it when you're on cross exam, then

Jury Trial-Vol.2                              11/1/2016

 1   perhaps we can bring her in, but not here.

 2            **MR. ROYAL:**  All right.

 3   **BY MR. ROYAL:**

 4   **Q**     Agent Nichols, in your review of the equipment that you

 5   seized from the house in connection with the search, you found

 6   a still photograph; is that correct?

 7   **A**     Yes, sir.

 8   **Q**     And that still photograph was a photograph of a young

 9   woman performing an act of oral sex on a male; is that correct?

10   **A**     That's correct, yes, sir.

11   **Q**     And the photograph appears to have been taken by the male

12   figure; is that correct?

13   **A**     It does appear, based on the way the photograph is, that

14   it was taken by a male, possibly the one who's the recipient of

15   that oral sex.

16            **MR. ROYAL:**  Your Honor, could we display that

17   photograph, your Honor?

18            **MS. SMITH:**  I object, your Honor.  As I noted this

19   morning, this is improper impeachment.  It cannot be published

20   to the jury.  It's extrinsic evidence.

21            **MR. ROYAL:**  Well, my understanding of the

22   Government's position is that it could be published to the

23   jury.

24            **MS. SMITH:**  Incorrect.  And I was very clear about

25   that.  It was extrinsic evidence that is inadmissible in this

Jury Trial-Vol.2                          11/1/2016

1   trial.  He may use it only to impeach, which frankly he's not

2   doing.

3            **THE COURT:**  I agree with the Government's position on

4   that.

5            **MR. ROYAL:**  I'm sorry, your Honor?

6            **THE COURT:**  I agree with Ms. Smith.

7            **MR. ROYAL:**  I think it's essential that the jury have

8   a chance to see this photograph in order for me to cross

9   examine Agent Nichols about it.

10           **THE COURT:**  You have said that about several things,

11  and some of them I can't believe.

12  **BY MR. ROYAL:**

13  **Q**   All right.  Agent Nichols, you testified about that

14  photograph before the grand jury; is that correct?

15  **A**   Yes, that was part of multiple items we dealt with, but

16  yes.

17  **Q**   Okay.  You were asked questions before the grand jury

18  about that photograph we've just described; is that correct?

19  **A**   Yes, I was.

20  **Q**   Okay.  You were asked if you could identify the people in

21  that photograph; is that correct?

22  **A**   Something to that effect.  I don't remember the exact

23  question, but I'm sure that was asked.

24  **Q**   And you testified that the people in that photograph were

25  Courtney Jennings and Tommy Lee Jones, my client; is that

Jury Trial-Vol.2                        11/1/2016

1    correct?

2    **A**     Yes.

3    **Q**     You testified to that under oath; is that correct?

4    **A**     That's correct.

5    **Q**     Even though you can't see the face of the male figure in

6    the photograph?

7    **A**     That's correct.

8    **Q**     But you testified based upon your opportunity to see

9    Courtney Jennings at the house and close up, you testified that

10   she was the female in that picture; is that correct?

11   **A**     That is not the sole reason.

12   **Q**     Well, did you recognize her in the picture from seeing her

13   at the house?

14   **A**     She did have similar facial features to Courtney Jennings,

15   yes.

16   **Q**     Isn't it true the woman in the photograph was much lighter

17   skinned than Courtney Jennings is?

18   **A**      It is true that the photograph is taken with what appears

19   to be a very bright flash which tends to lighten every skin

20   tone in the room.  You also notice in the background that it

21   appears very dark as a result of that flash.

22   **Q**     And you agree there was some kind of a baby basinet in the

23   background of the picture; is that correct?

24   **A**     It appears to be, yes, sir.

25   **Q**     And that photograph had a date imprinted on it of

Jury Trial-Vol.2                              11/1/2016

1   February 22nd, 2011; is that correct?

2   **A**    I know it was February of 2011.  I'm not sure of the day.

3   **Q**    Okay.  And this picture was found on something that's

4   called an SD card; is that correct?

5   **A**    Yes, sir.

6   **Q**    What is an SD card?

7   **A**    An SD card is a small storage device.  This one in

8   particular was about the size of a quarter, and it's something

9   that you would put in a camera to record video on.  That can

10  also be plugged into the computer and used as storage or for

11  transferring files.

12  **Q**    And you were asked if you found an image of Courtney

13  Jennings on that SD card; is that correct?

14  **A**    Again, I don't know the exact question, but if you're

15  going to ask me that, I'm going to tell you yes.

16          **MR. ROYAL:**  May I approach, your Honor?

17          **THE COURT:**  You may.

18  **BY MR. ROYAL:**

19  **Q**    Let me hand you a transcript of your testimony --

20          **THE COURT:**  We've got to get done here pretty soon,

21  though, if there's any control you have over what you're asking

22  and how soon you're done today.

23          **MR. ROYAL:**  Thank you, your Honor.  I will try to

24  take a break in the near future.

25

Jury Trial-Vol.2                                    11/1/2016

1    **BY MR. ROYAL:**

2    **Q**     Referring to you Page 13, Agent Nichols, of your testimony

3    before the grand jury on November 5th, 2015.  You testified

4    that Courtney Jennings was performing oral sex on what appears

5    to be Tommy Lee Jones; is that correct?

6    **A**     The exact quote is, "She is performing oral sex on what

7    appears to be Tommy Lee Jones."

8    **Q**     And that was a reference to Courtney Jennings, correct?

9    **A**     Yes.

10   **Q**     And I asked the date that was taken, you said

11   February 22nd, 2011?

12   **A**     That's correct.

13   **Q**     And were you asked if you had done a forensic review of

14   that date?

15   **A**     That's correct -- no -- yes, yes, I did.

16   **Q**     And you said that you got several dates connected with

17   this photograph; is that correct?

18   **A**     No.

19   **Q**     Okay.

20   **A**     That quote you're talking about there is in general.

21   **Q**     Not directed to this specific photo?

22   **A**     Yes, sir.

23   **Q**     All right.  Fine.  Thank you for straightening that out

24   for me.

25          You said that in your forensic evaluation, you were

Jury Trial-Vol.2                    11/1/2016

1    looking for the date that was the last time the photograph had

2    been changed; is that correct?

3    **A**    That is correct.

4    **Q**    What do you mean by changed?

5    **A**    So that is when the photograph is altered in any form or

6    fashion.  That could be when it was taken.  It depends, again,

7    on where the device is located, where the image we're looking

8    at is located, but in general, I'm looking for the last time

9    anything changed with that photo, whether it be cropped,

10   enlarged, zoomed in, resaved, that's the date I was looking at.

11   **Q**    And so your determination from your evaluation was that

12   the last time that photograph was changed was February 22nd,

13   2011; is that correct?

14   **A**    Yes, that's what I said.

15   **Q**    And that -- so you're not claiming that's necessarily the

16   date on which that photograph was taken?

17   **A**    No, I guess it's the date that it was last changed.  It's

18   indicative of a photograph, that's on an SD card, for the last

19   time it was written to be the date it was taken.

20   **Q**    It could be?

21   **A**    It generally is.

22         **MR. ROYAL:**  With that, your Honor, I would suggest we

23   break for the day.

24         **THE COURT:**  All right.  Are you saying that for the

25   time being you're done with Agent Nichols?

Jury Trial-Vol.2                              11/1/2016

1           **MR. ROYAL:**  No.

2           **THE COURT:**  Or you're --

3           **MR. ROYAL:**  I would like to resume my cross

4    examination tomorrow.

5           **THE COURT:**  -- looking to come back tomorrow morning?

6    Have you got a lot more to go with him?

7           **MR. ROYAL:**  Yes.

8           **THE COURT:**  I'm not sure how much you're going to do

9    it, unless you sharpen up a little bit what you're talking

10   about.  I think we're wasting the jury's time on a lot of this.

11   Anyway, Agent Nichols, you're done for the day I guess and be

12   back tomorrow I assume.

13          **THE WITNESS:**  Okay.  Thank you, sir.

14          **THE COURT:**  And I will ask the jury if they will

15   accept my thanks for their time here and their attention.

16          Are you going to sit down or are you going to stand

17   at the lectern?

18          And the usual instructions, not to talk to anyone,

19   including each other and not take in any information from any

20   place and be ready to accept my instructions when you're going

21   to deliberate.  Actually, some things are hard to believe.

22   Sometimes I don't believe them when I say them, but I think

23   we're moving this case pretty well and we're going to move it

24   more when you get here tomorrow, as long as we can do it fairly

25   to the Defendant and the Government.

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                        11/1/2016

1          Now, I don't know what's going on outside, but I hope

2    you be careful out there and stay out of the rain if there is

3    rain.

4          Thank you.  Thank you very much for being here.

5    Please go to the jury room.  9:00 tomorrow morning.

6                    (Jury out 12:29 p.m.)

7          **THE COURT:**  Anything either the Government or the

8    Defendant would like the record to reflect now?

9          **MS. SMITH:**  Yes, your Honor.  If I may, we had this

10   conversation yesterday and again this morning.  I think

11   Mr. Royal has, though I don't think properly, has tried to use

12   that image from Count 1 to impeach as best he can, and I

13   maintain my position that it's not relevant to this case.  And

14   so when he comes back to cross examine again tomorrow, I don't

15   know if he intends on bringing this up again, but it's the

16   Government's position that the identity of the people in that

17   image is extrinsic to what needs to be determined in this case.

18         **MR. ROYAL:**  Your Honor, I --

19         **THE COURT:**  Now, just let me -- that is not something

20   I ruled on when you objected?

21         **MS. SMITH:**  You have.  I'm just reiterating that he

22   went on and on and on about that picture in cross examination

23   just now, outside of the scope of the direct and outside of the

24   impeachment rules.

25         **MR. ROYAL:**  Your Honor, can I respond?

Jury Trial-Vol.2                              11/1/2016

1          THE COURT:  Yes.

2          MR. ROYAL:  I'm not referring or bringing up in any

3   way Count 1, the fact that it ever existed or the fact that

4   it's been dismissed.  The issue is the credibility of this

5   witness who is the, frankly, the key witness, in my opinion,

6   against my client in this case, and the fact that he's a law

7   enforcement officer does not prevent me from bringing before

8   this jury evidence that's material that in fact --

9          THE COURT:  That has nothing --

10          MR. ROYAL:  -- impacts upon his credibility.

11          THE COURT:  -- nothing to do with your right to cross

12   examine, but your being relevant in your cross examination and

13   your eliciting something that might conceivably help the jury

14   does have something to do with your cross examination, and to

15   the extent that I have intervened and said that that is not

16   appropriate, have sustained objections, that's what I'm

17   thinking of.

18          MR. ROYAL:  Well, my position, your Honor, is that

19   this witness' identification of Courtney Jennings in that

20   photograph is a false identification and I can prove it, and

21   the Prosecutor has obtained a ruling from this Court that my

22   client's relationship with his stepdaughter is admissible in

23   this case.  So this goes directly to their relationship or

24   alleged relationship and it goes directly to this witness'

25   credibility as to whether he testified truthfully under oath

                    USA v Jones, Case No. 15-20713

Jury Trial-Vol.2                    11/1/2016

1   when he claimed it was Courtney Jennings in that photograph,

2   because I claim -- if I can show the photograph to the jury I

3   can identify -- I claim if I can be allowed to use this

4   photograph with other witnesses, I can identify who's in there

5   and I can then argue to the jury that it was obviously not

6   Courtney Jennings.  Courtney Jennings is obviously not the

7   person in that photograph, and that goes to the credibility of

8   this witness on a material issue to this case.  That's why I'm

9   asking the Court to allow me to pursue this line of inquiry

10  because it's essential to my client's defense.

11          **MS. SMITH:**  Your Honor, the Federal Rules of Evidence

12  are quite clear that if the issue is not material, which it is

13  not in this case -- he's not charged with that count; he is not

14  charged with producing that image -- if it's not material,

15  extrinsic evidence may not be admitted in order to prove a fact

16  that's not material.  As I said this morning, he is allowed --

17  the proper way to impeach him is to say, "Did you testify that

18  this was Courtney and the Defendant?"  And when he says, "Yes,"

19  he is allowed to ask, "And that was lie, wasn't it?"  And he is

20  stuck with the answer that the witness gives.  That's how the

21  Federal Rules of Evidence work.  They are designed to keep away

22  from the jury those things that the jury does not need to

23  concern themselves with deciding.  What his intention to do is

24  to prove that the image is factually inaccurate, which even if

25  he could prove that it's not them in the picture, that doesn't

1    prove that the witness made false testimony if he believed it

2    to be true.

3              **MR. ROYAL:**  But I can make --

4              **THE COURT:**  You are speaking well and at length and

5    you're saying what I think I've agreed with before.

6              **MS. SMITH:**  Thank you.

7              **THE COURT:**  And I agree with it here.

8              **MS. SMITH:**  Thank you, your Honor.

9              **THE COURT:**  This is, as Ms. Smith just said, even if

10   it's true, you're beating an issue which is not relevant to the

11   decision of the jury, and you're doing to it in a way that

12   could be misleading and I'm not going to allow that.

13             **MR. ROYAL:**  I'm not trying to mislead the jury but I

14   have the right to argue to them --

15             **THE COURT:**  I didn't say you were trying to mislead

16   them but I said what you're seeking could mislead them.

17             **MR. ROYAL:**  Well, I don't want to mislead them, your

18   Honor.  I want to present this evidence in front of them and

19   it's not -- I'm not stuck with his self-serving statement that

20   he didn't lie.  I mean every witness would say that.  If that

21   were the case, we'd have no need for the rules of evidence.

22   The rules of impeachment allow me to bring out evidence

23   contrary to the testimony of this witness on a material point.

24   The identification of Courtney --

25             **THE COURT:**  Mister --

Jury Trial-Vol.2                              11/1/2016

1          **MR. ROYAL:**  -- Jennings in the photograph is

2    material, especially in light --

3          **THE COURT:**  Mr. Royal, I've ruled, and I am not going

4    to spend more time doing it and I think if you have any

5    question about what you can do with this witness with regard to

6    that picture and the person in that picture, whether or not

7    it's who he testified to, you're done.  You're not going to do

8    anything more than on that.  That's my ruling.

9          And anybody got anything else to say?

10         **MS. SMITH:**  No, your Honor.

11         **MR. ROYAL:**  Not at this time, your Honor.

12         **THE COURT:**  All right.  Well, have a good night and

13   come in here at 9:00 tomorrow.

14         **MS. SMITH:**  Thank you, your Honor.

15         **THE COURT:**  Mr. Jones is remanded.  You can talk if

16   you've get something to talk about, but you're remanded.

17              (Proceedings concluded 12:35 p.m.)

18                          - - -
                   **C E R T I F I C A T I O N**
19         I, Andrea E. Wabeke, official court reporter for the
     United States District Court, Eastern District of Michigan,
20   Southern Division, appointed pursuant to the provisions of
     Title 28, United States Code, Section 753, do hereby certify
21   that the foregoing is a correct transcript of the proceedings
     in the above-entitled cause on the date hereinbefore set forth.
22   I do further certify that the foregoing transcript has been
     prepared by me or under my direction.
23   /s/Andrea E. Wabeke                    October 17, 2017

24   Official Court Reporter                Date
     RMR, CRR, CSR
25                          - - -


                USA v Jones, Case No. 15-20713